## SAMUEL H. MELVIN *et al.*

*v.*

## THE LAMAR INSURANCE COMPANY *et al.*

1. SUBSCRIPTION—*whether a subscription or security for a loan.* Where a contract with an insurance company recites an absolute agreement " to subscribe for and purchase 5500 shares of the capital stock " of the company, and to pay therefor to the company $550,000 in certain installments, and provides that the subscription and purchase shall be made in ten days, and gives the subscriber the option to have the company resell or repurchase the stock within a given time, and under the agreement the subscription was made and certificate of stock issued, it was *held,* that this was an actual subscription, and that the shares were not taken as collateral security for a loan. The option in such case is a right secured by the contract above, and in addition to the absolute title to the stock.

2. SAME—*right to cancel same as against other stockholders.* Where a subscription is made to an insurance company to a large amount, and twenty per cent paid in to enable the company to procure the Auditor's certificate, but under a contract giving the subscriber the right to withdraw the sum so paid in and have the subscription canceled, and other large subscriptions are afterwards made to the capital stock by parties, without actual notice of the contract, and believing the subscription to be a permanent one, it was *held,* that such subscription could not be canceled and the money paid thereon withdrawn, without the knowledge and consent of those subscribing on the faith of it.

3. SAME—*presumption in respect to.* All subscriptions are presumed to be upon the same basis, and all shares entitled to the same benefits and subject to the same burdens, and in the subscription of each person every other subscriber has a direct interest, and a right to have the same remain and contribute in future burdens.

4. SAME—*agreement for withdrawal, fraudulent.* A subscription to the capital stock of a corporation of a large amount, coupled with a right, under a separate contract, to surrender the certificate of stock, and take back the money paid therefor, and cancel the subscription, is a fraud upon the

other subscribers, and such agreement will be treated as void, and the party so subscribing held to all the responsibilities of a *bona fide* subscriber.

5. SAME—*releasing not allowed.* The subscribed capital stock of a corporation, as well as its other property, is a trust fund for the benefit of creditors, and a subscriber can not be released from his obligation to pay, to the prejudice of creditors or of any other stockholder.

6. SAME—*stockholders not bound to take notice of contract limiting and qualifying absolute subscription.* Where a certificate of stock is issued, unaccompanied with any evidence of a condition, and the books of the company show the stock to be *bona fide* and absolute, other subscribers will have the right to rely on what thus appears as being true, and are not bound to go back and take notice of an antecedent individual contract existing between the directors and the takers of such shares, and it seems that even if such contract is spread upon the record, it affords no notice to other stockholders.

7. AGENCY—*power of agents to release claim.* Where a committee appointed by the stockholders of an insurance company, to settle the affairs of the company as they might deem equitable and best; and, second, that if, in their opinion, the affairs of the company should be wound up, then giving them authority to collect the assets, sell the franchise, and distribute proceeds, after paying debts; and, third, if they should deem it desirable to continue the business, to instruct the central committee to make an assessment, and the committee determined to wind up the affairs, it was *held*, that they had no authority in that event to settle with and release a subscriber who had wrongfully withdrawn money paid on his subscription and canceled his subscription. The only power the committee had was to collect the same.

8. Authority to collect and distribute, does not embrace the power to release without payment.

9. RELEASE—*of claim by agent without consideration not valid.* A release of a claim by a committee of the stockholders of a corporation, not under seal, and for no consideration, except the waiver of a questionable right to one of the parties for additional compensation as vice-president, and procured by taking advantage of the party's confidential relation, and his control of the available assets of the corporation, will not be enforced in a court of equity.

10. AGENCY—*ratification by acquiescence.* Where a committee of stockholders of a corporation made a settlement with another stockholder, releasing him from a claim, in June, 1871, and suit was brought by certain stockholders to enforce the claim so released, in July, 1873, the delay in bringing suit will not be such an acquiescence in the acts of the committee beyond their power as to ratify their action.

11. CORPORATION—*remedy by stockholders as against another who is wrongfully released.* Where a stockholder in a corporation, under a prior

contract to his subscription, is allowed by the directory to surrender his stock, and take back the assessments paid by him, in fraud of the other stockholders, any such stockholder so injured may, by bill in equity, have the money so withdrawn refunded, and the stockholder so withdrawing declared liable on his subscription, in any and all assessments, the same as other subscribers.

WRIT OF ERROR to the Superior Court of Cook county; the Hon. T. D. MURPHY, Judge, presiding.

The bill of complaint, in this case, was exhibited on the 31st of July, 1873, by the complainants, as stockholders in the Lamar Insurance Company, of Chicago, on behalf of themselves and all others similarly situated, against the company, William H. W. Cushman, Isaac N. Hardin, and others.

It charges, in substance, that the officers of the company, and Cushman & Hardin, who were bankers in Chicago, were guilty of collusion and fraudulent conduct, prejudicial to the rights and interests of the other stockholders, more especially in this, that Cushman & Hardin having, in September, 1869, subscribed for and taken a large amount of the shares of said company, to-wit: 5500 shares, and paid for the same in the usual way, were afterwards permitted to and did surrender all of said shares, and withdraw from the company all the money and assets, which had been paid by them therefor; that they were at the time officers of the company, Cushman being the treasurer, and Hardin vice-president; and that their acts were in bad faith towards the other stockholders; that in addition to the money and assets ($110,000,) so withdrawn by Cushman & Hardin, upon the surrender of their stock, they also withdrew the further sum of $70,000 from the assets of the company, and appropriated the same to their own use; that judgments were recovered against the insurance company, and executions being returned unsatisfied, a receiver of the company was appointed under a creditor's bill filed against the company and others; that the terms of payment for stock, as provided by the by-laws of the company, were 5 per cent cash, and 15 per cent in three equal installments, in three, six and nine months from date of subscription; the remaining 80

per cent being included in what is called a stock note, subject to payment upon calls made by the board of directors; that the receiver, under order of the court, had made a call of 20 per cent upon the stockholders, but that he ignored Cushman & Hardin as stockholders for the 5500 shares, which had been issued to them, and their liability to refund the moneys withdrawn by them from the company; that there is a large amount of the first installment of 20 per cent unpaid upon stock subscriptions; that others of the defendants have moneys belonging to the company, and that all these sums, including the moneys withdrawn by Cushman & Hardin, ought to be collected and applied to the payment of the debts, before resort is had to an assessment upon the stock.

The prayer of the bill is that Cushman & Hardin be required to refund the money withdrawn by them, and that they be compelled to take the position of stockholders in respect to the 5500 shares of stock which they surrendered, etc.

Cushman & Hardin's answer claims that the money by them withdrawn from the company was in payment of a loan; that they only held the 5500 shares as security, upon which they advanced the $110,000; that the $70,000, withdrawn by them, was also a loan; and they make an exhibit to their answer a copy of the contract, under which they received the 5500 shares, and paid the $110,000 in money and securities to the company. They also claim that the stockholders, at a meeting in May, 1871, ratified and confirmed the action of the officers and directors of the company, including the surrender of stock and withdrawal of moneys, and that a committee of the stockholders, at that meeting, fully released and discharged them from all liability in respect to the transactions complained of in the bill.

Exhibit A, before mentioned, of the answer of Cushman & Hardin, commences by reciting that the Lamar Insurance Co. began business, relying upon sale of its stock for a supply of capital to insure payment of its losses, and has, up to date, sold about $550,000; that its liabilities are about $6,000, and its assets from stock subscriptions, now being paid and falling

due within nine months, are about $80,000; that the Auditor requires of the company the ownership of $100,000 in acceptable securities, and that, although his demand is unlawful and could be successfully resisted, yet litigation would ruin the credit of the company, and they have concluded to sell stock to enable them to comply with the Auditor's requirements; that Cushman & Hardin, bankers of Chicago, have been induced to advance means to enable the company to comply with the law. The contract then proceeds: " Now, therefore, this contract, made this 16th day of September, A. D. 1869, between the Lamar Insurance Company, by Leonard Swett, its president, party of the first part, and Messrs. Cushman & Hardin, party of the second part, *witnesseth*, that the party of the second part does hereby agree to subscribe for and purchase 5500 shares of the capital stock of said company, and to pay therefor, to said party of the first part, the sum of $550,000, as follows, to-wit: $35,000 in cash, and $75,000 in such first mortgages or other securities indorsed by the said Cushman & Hardin, as shall be acceptable to the Auditor of the State of Illinois, and such as shall be accepted by said Auditor as a proper security to be held by said company to insure the payment of its policies, and in compliance with the General Insurance Law of the State of Illinois, and the remaining 80 per cent of said stock, not paid as aforesaid, shall be subject to a call of the stockholders of said company, under its charter and by-laws.

"And whereas, in the ordinary course of the sales of its capital, said company exacts a payment of 5 per cent, and receives the bond of the stockholders without security for the remaining 15 per cent, in three, six and nine months, it is hereby agreed between the parties hereto, that in consideration of the aforesaid subscription, and the prompt payment of the 20 per cent as aforesaid, said company will pay said Cushman & Hardin the sum of $11,000, which payment shall be in 20 per cent paid stock, at 1½ per cent discount, being considered the cost of selling the same, and 80 per cent upon the same being subject to the call of the stockholders aforesaid. That is, in

payment of said $11,000 said company agrees to issue to said Cushman & Hardin 591 shares of said stock, with 20 per cent paid, and $25 in cash.

"And whereas, the said subscription may be larger than said Cushman & Hardin may desire to hold permanently, and, whereas, the said company have the authority, under their charter, to issue and sell five millions of its capital stock, and are now selling the same at the rate of 2000 shares a month, it is hereby agreed by and between the parties hereto, that at the expiration of one year from this date, at the election and request of said Cushman & Hardin, the said company shall re-sell, and place in the hands of other purchasers, such portion of the stock hereby subscribed for and purchased, as the parties of the second part shall desire, and without any expense to said Cushman & Hardin, and the said company hereby guarantees that the said re-sale shall equal in its net proceeds the amount of money and securities paid by said Cushman & Hardin, under this contract, and in the event of such re-sale said company shall re-pay to said party of the second part the full amount of money paid by them under this contract, and shall return to them the securities also paid under this contract, which shall be accepted by said Cushman & Hardin in full payment of all liabilities of said company to them. Or, if said party of the second part shall prefer, said company, upon demand at the expiration of one year from the date hereof, shall re-purchase any portion of said stock which Cushman & Hardin shall demand, and shall pay them for the same the amount paid by said Cushman & Hardin, without interest, and shall refund to them the securities received by said company, in payment for the subscription aforesaid, which sum of money repaid and which securities returned, as aforesaid, shall be in full discharge of all liabilities under this contract.

" If the said parties of the second part shall desire to have re-sold, or to have the company re-purchase any portion of said stock, less than the full amount subscribed for and purchased as aforesaid, the said company hereby agrees to re-sell or re-purchase the amount named by said parties of the sec-

ond part, in which event the company shall repay a *pro rata* amount of the money or securities paid under this contract.

" It is also agreed that all moneys of said company, as soon as received, shall be deposited with said Cushman & Hardin, as bankers, from which deposits the company shall check out whatever amounts are necessary to the successful prosecution of its business, and the surplus, whenever the amount shall reach $30,000, the company shall, if desirous of doing so, check out, and invest all but $10,000 in such securities as the party of the first part shall deem for the best interests of the company.   Such securities, when purchased, shall be deposited with the treasurer of the company.

" If, at the expiration of one year from the date hereof, said Cushman & Hardin shall not request the re-sale and re-purchase of said stock, or some portion thereof, then said company shall be discharged from all liability under the contract.

" And, whereas, said company hopes to be able, if Cushman & Hardin desire it, to re-purchase any or all of said stock before the expiration of the year from this date, it is therefore agreed that if Cushman & Hardin shall desire to close the transaction before one year, the company will, at any time hereafter, take up any of said stock, when they can, in small quantities, provided they can do so consistently with their obligation to their policyholders, and with due regard to the proper management of said company.

" In the event of a re-sale or a re-purchase by the company of all or any portion of the stock subscribed for, under this contract, the company agree, in repaying the securities, to account for any interest which they may have collected upon the same.   The subscription and purchase named in this contract shall be made within ten days from this date.

" Dated at Chicago, September 17, 1869.

Signed,                                        LEONARD SWETT, *Pres't.*
                                                       CUSHMAN & HARDIN."

The memoranda indorsed upon said contract are to the following effect:.

"1.   Under date of September 17, 1869, it is agreed, as part of the contract, that all interest upon the securities paid shall accrue to the benefit of Cushman & Hardin for one year, and if, at the end of the year, they elect to keep the stock, the company shall pay to them all the interest it has received on said securities, taking the securities at their face in payment for the stock.

"2.   Under date of May 6, 1870, is indorsed a cancellation of $100,000 of the stock, and a re-payment of the percentage paid thereon; also a modification of the contract so as to give the company the option within the year to cancel the stock upon the terms and conditions named in the contract.

"3.   Under date of October 26, 1870, is indorsed a cancellation of $125,000 of the stock, and a return of the percentage paid thereon; also an extension of the contract for six months, in consideration of which the company agrees to pay Cushman & Hardin $3459, payable monthly.

"4.   Under date of April 10, 1871, is indorsed a cancellation of the remainder of the stock, and the re-payment to Cushman & Hardin of $65,000, being the amount paid by them thereon.

"5.   Without any date, is the following indorsement: 'It is hereby agreed, as a part of this contract, that the $11,000 paid in stock shall be in lieu of dividends upon the principal, for one year from the date of this contract.'"

Upon the hearing, the court below dismissed the bill, and the record is brought into this court for the purpose of asking, especially, a reversal of the decree as respects Cushman & Hardin.

Mr. JOHN N. JEWETT, and Mr. SIDNEY SMITH, for the plaintiffs in error.

Messrs. MONROE, BISBEE & BALL, for the defendants in error.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

We have no doubt that, under the written contract of September 17, 1869, which was introduced in evidence with all

its indorsements, Cushman & Hardin were actual stockholders in the Lamar Insurance Company, in respect to the 5500 shares of stock which were the subject matter of the contract, and that they did not take the shares merely as collateral security for a loan of $110,000, in money and securities, as insisted upon in the defense, although the latter was the real transaction between the parties as intended by themselves.

The first clause of the contract, after the recitals, is an absolute agreement, on the part of Cushman & Hardin, "to subscribe for and purchase five thousand five hundred (5500) shares of the capital stock of said company, and to pay therefor, to said party of the first part (the Lamar Insurance Company), the sum of five hundred and fifty thousand dollars ($550,000), as follows:" The concluding words of the contract are, that " the subscription and purchase named in the contract shall be made within ten days from this date." Certificates for those 5500 shares of stock were actually issued to Cushman & Hardin, and they paid the 20 per cent, in accordance with the contract. Thereupon, Cushman & Hardin became the absolute owners of the 5500 shares, under the contract. Whether they should be re-sold or re-purchased by the company was entirely at the option of Cushman & Hardin, and in no manner detracted from the completeness of their title. The option was a right, secured by the contract, above and in addition to the absolute title.

Could Cushman & Hardin relieve themselves from their responsibilities as stockholders, by the surrender and cancellation of the certificates of stock and the re-payment by the company of their advances thereon, without consent of the other stockholders?

The Lamar Insurance Company was incorporated in 1865, but the first stock was subscribed in 1869. Its assets being insufficient to authorize it to do business under the General Insurance Law of 1869, the Auditor demanded that the company should have $100,000 in acceptable securities and assets, and, although the company disputed the right of the Auditor to make this demand, and claimed exemption from the opera-

tion of the law of 1869. in order to avoid litigation. as alleged, the company concluded to comply with the demand. It appears, too, from testimony in the case, that there was difficulty in selling stock in the country, without the Auditor's certificate. It seems the only means the company had for raising the further assets demanded by the Auditor was, by a sale of its capital stock. Resort was had to Cushman & Hardin, and the arrangement of September 17, 1869, was entered into.

The stock taken by Cushman & Hardin, under that arrangement, enabled the company to comply with the Auditor's demand, and procure his certificate and authority to do business. Mr. Brinkerhoff, superintendent of the insurance department, in the office of the Auditor, says that, whilst he was examining into the condition of the company, at that time, the president of the company and Hardin both assured him that the assets shown to him were the *bona fide* assets of the company, and that stock was issued to Cushman & Hardin in payment for the securities. The certificates of stock were exhibited to him. The Auditor's certificate bears date October 4, 1869, and was made part of a circular shortly thereafter issued by the company, in which it is stated that the subscribed capital is $1,021,000, and the paid up capital $141,800. Mr. Brinkerhoff's certificate is also included, showing the assets of the company to be $210,518.58, which must have included the money and assets furnished by Cushman & Hardin. A letter of the president of the company to Phillips, who was the agent of the company at Danville, under date of December 29, 1869, and which was certified to by Cushman & Hardin as correct, and which would appear to be a circular letter to be sent to the agents of the company, was in evidence, and in that the sales of stock are set down at $633,000 for the month of September, 1869, which, of course, must have included the 5500 shares to Cushman & Hardin. Several persons, among them Vandewater, one of the complainants, who subscribed for stock subsequent to September 17, 1869, testify that Cushman & Hardin were represented to be large stockholders, at the time they subscribed for their stock.

Thomas, one who so subscribed, says that Cushman himself stated to him that he had something like $500,000 of the stock, although Cushman denies this in his testimony.

There were subscriptions made to the stock of the company, after September 17, 1869, to an amount exceeding $1,200,000.

This, then, is the condition of Cushman & Hardin in respect to these 5500 shares. Certificates of stock were issued to them in the usual form, and it so appeared upon the books of the company. The exhibition and representation of the certificates as *bona fide* certificates, and of the assets as *bona fide* assets, enabled the company to obtain the Auditor's certificate.

Cushman & Hardin held themselves out, and allowed others to represent them, as stockholders for that amount, or, that their stock was a part of the subscribed stock of the company. Thereafterward, subscriptions to the stock of the company were made to a large amount.

The persons thus subscribing had no reason to suspect that the stock taken by Cushman & Hardin stood upon any different footing from that which they received. They had a right to suppose that the 20 per cent upon these 5500 shares had been paid in, to remain permanent assets of the company for the payment of its debts, and that the remaining 80 per cent was, equally with the 80 per cent of the stock for which they subscribed, liable to be called in to supply any deficiency.

All subscriptions are presumably upon the same basis, and all shares entitled to the same benefits and subject to the same burdens. In the subscription of each person every other subscriber has a direct interest.

There purported here to have been a large amount of stock taken, whereas, in fact, there was really no stock taken—the issue of the shares to Cushman and Hardin being coupled with the right on their part to surrender them and take back their money. Such a private arrangement with an individual subscriber, although it may not be intended, is, in law, a fraud upon the other subscribers; and such agreement will be disregarded, and the party be held bound to all the responsibilities

of a *bona fide* subscriber. This is the doctrine, as we regard, abundantly established by judicial decisions.

In the case of *Blodgett* v. *Morrill*, 20 Vt. 509, Morrill had subscribed, with others, for the purpose of erecting a church building, upon the understanding made with the agent procuring the subscriptions, that he should not be required to pay, and he attempted to set up that understanding as a defense to an action to recover the amount of his subscription, and the court say: " Such contracts are always void as to those persons whose rights are attempted to be affected by the fraud. Here, the alleged fraud consisted in the alleged agreement not to enforce the subscription. * * * The rest of the association knew nothing of any such secret agreement. The defendant knew the subsequent subscribers were to be decoyed by his name. Clearly, then, he ought to be held to his contract. And the only sure mode of defeating the contemplated fraud, is to compel the defendant to do as he gave the other members of the association to believe he intended to do."

In the case of *White Mountain R. R. Co.* v. *Eastman*, 34 N. H. 124, Eastman subscribed for stock, and took an agreement, in writing, that he might, within one year, surrender a part of the shares taken by him, and be discharged. The court held such secret agreement void, as a fraud upon other subscribers, and that among the subscribers themselves the subscription was to be regarded as an agreement with every other subscriber to bear that proportion of the common burthen to which the subscriber professes to bind himself by the contract which he holds out to them as his contract with the corporation.

In *Robinson* v. *Pittsburgh and Connellsville Railroad Co.* 32 Penn. St. 334, it was held to be no defense to an action to recover a subscription to the stock of a railroad company, that it was made at the request of the president of the company, with the understanding that the defendant was not to pay for or hold the stock subscribed for, and that the same would be canceled; that such an agreement would be a fraud on the company, and on all subsequent subscribers, and whilst the

defendant might reap no advantage from it, he would be held to all the responsibilities of a *bona fide* subscriber.

It was said in *Graff* v. *Pittsburgh and Steubenville Railroad Co.* 31 Penn. St. 489, that a subscription to a joint stock company is not only an undertaking to the company, but with all other subscribers, and even if fraudulent as between the parties, is to be enforced for the benefit of others in interest.

In *Stanhope's case*, 1 Law Reports, 1 Chancery Appeals, 161, the directors of a company made an arrangement with a shareholder that on payment of a certain sum of money his shares should be forfeited for non-payment of a call which had been made. The money was paid, and the shares transferred to the company. Twelve years afterward, the company was wound up, and two years later still an application was made to place the shareholder's name on the list of contributors. The court held that the shareholder's name ought to be placed on the list, as the arrangement was not within the power of the directors and was a fraud on the other shareholders; and see *Mangles* v. *Grand Collier Dock Co.* 10 Simons, 519; *Preston* v. *Same*, 11 Simons, 327.

" But if the subscription were feigned and fraudulent, the subscriber, actual or pretended, is still bound to comply with all the terms and responsibilities imposed upon him, in the same manner as if he were a *bona fide* subscriber," per Story, J., in *Minor* v. *The Bank of Alexandria*, 1 Pet. 65.

An agreement giving the privilege of paying up a stock subscription in goods or otherwise, except in money, as contemplated by the charter, will be considered as a fraud upon other stockholders, and payment may be enforced in money. *Hervey* v. *Vermilion and Ashland Railroad Co.* 17 Ohio, 187; *Downie* v. *White*, 12 Wis. 176.

This court said in *Chandler* v. *Brown*, 77 Ill. 335, " Each stockholder has a vested right in the contract of subscription of every other stockholder."

The subscribed capital stock of a corporation, as also all its other property, is a trust fund for the benefit of the general creditors of the corporation, and its governing officers can not,

by agreement with a stockholder, release him from his obligation to pay, to the prejudice of its creditors, except by fair and honest dealing for a valuable consideration. *Sawyer* v. *Hoag*, 17 Wall. 620; *New Albany* v. *Burke*, 11 id. 106. And no more can they do so, we conceive, to the prejudice of stockholders. See, also, *Selma and Tennessee Railroad Co.* v. *Tipton*, 5 Ala. 787; Ang. and Ames Corp. secs. 146, 535, 600, 1 Redf. on Railways, 206.

It is insisted by counsel for defendants in error that the authorities cited are distinguishable from the present case, in that they are cases where the subscription itself was unconditional, and it was sought to be avoided by setting up a collateral agreement, either made by parol or by some other disconnected writing; whereas, here, the conditional character of the subscription appears upon the face of the subscription itself—the written contract of Sept. 17, 1869; that a party has a right to make any condition he pleases to a subscription, provided the condition is expressed in the contract; that what he is forbidden to do, is to make an unconditional subscription, accompanied by a secret stipulation, parol or written. There would be more force in this position, did the transaction rest entirely in the contract of Sept. 17, 1869. Then, the only evidence of Cushman & Hardin's connection with the stock would show that they were *only conditionally* connected with it, and it might plausibly be said that subsequent subscribers for stock could not be deceived or misled thereby. But there is more than that contract. There were certificates of stock issued in the usual form, and it so appeared upon the books of the company.

Here were the evidences of the right in the stock. They were unaccompanied by any sign of a condition. They showed the stock taken to be real, *bona fide*, absolute stock—the same as all other issues of shares of stock. It is, we think, upon these latter evidences, the certificates of stock, and the books of the company showing their issue, that others would be entitled to rely, and rest upon, as showing the character of the stock taken; and that they should not be held

bound to go back and take notice of an antecedent individual contract existing between the directors of the company and the takers of the shares. This being so, there would be here the same evil—the liability to be misled and deceived by these unconditional certificates of stock, and their so appearing on the books of the company—as there is in the case where there is but a mere subscription, and the unconditional subscription is accompanied by a separate, collateral agreement qualifying it. The absolute character of the certificates of stock is sought to be qualified by a separate individual contract, in the same manner that, in the other case, an unconditional subscription of stock is attempted to be qualified by a separate collateral agreement. The qualifying agreement would seem to be of as secret a nature in the one case as the other.

We must think that this case is brought within the principle of the authorities referred to, so as to render them applicable and of controlling effect.

It is said that the subscriber to the stock of an organized company is bound to know the state of the records of the company; and that every person who subscribed here, was bound to know what this contract of September 17, 1869, was. The record book of the company was destroyed in the fire, in Chicago, of October 8 and 9, 1871. There is conflicting evidence whether the contract was spread upon the records of the company or not. But assuming that it was, it would be most unreasonable to hold that the subscribers to the stock of this insurance company, scattered abroad as they were, should be held to be bound by any presumed notice of what was being done by the directors of the company, in the city of Chicago, in matters affecting their interests as such stockholders. In *Stanhope's case*, above cited, it is held that the shareholders in a company are not bound to look into the management, and will not be held to have notice of everything which has been done by the directors, who may be assumed, by the stockholders, to have done their duty.

It is supposed by counsel for defendants in error that it was necessary that the complainants in the court below should have

made proof that they were influenced, in subscribing for the stock of this corporation, by this pretended subscription of Cushman & Hardin, and it is said they have failed in doing so.

We see no distinct proof of this. But it must be supposed that they and other subscribers were thus influenced by the amount of the subscriptions which had been made to the stock of the company, a part whereof was this large amount taken by Cushman & Hardin.

Holding, as we do, that this option to surrender these shares of stock, and take back the money and securities, was invalid, and to be disregarded as a fraud against the other stockholders, the transaction of the directors of the company in the cancellation of the stock, and repayment of the money and securities, must be held here as of no effect.

It was not an independent, fair dealing in respect to the stock for a valuable consideration, but it was action had under the contract only, and but the allowance and carrying out of the exercise of the option of the contract, and equally invalid with the option itself.

But it is claimed that if the directors of the company had not the power to make and carry into execution the optional part of the contract of September 17, 1869, as to the surrender of the stock, that the stockholders, at the annual meeting in May, 1871, approved and ratified all the transactions between Cushman & Hardin and the board of directors. It would appear, from the evidence, that when the stockholders came together, at that time, the transactions between the directors and Cushman & Hardin were unknown, or generally unknown, to them. That when the facts respecting those transactions were made known to them, there was very great dissatisfaction manifested, an excited discussion ensued, the meeting continuing for two days; the sessions, as described by the testimony, being "pretty stormy"—the excitement being in relation to this Cushman & Hardin affair.

The resolutions which were actually passed at the meeting, and are set out in the record, were passed near the close of the second day, and do not contain any words of approval or ratifi-

cation of these transactions. But it is insisted that there were other resolutions passed, which did ratify them. The evidence upon this point is conflicting. Some witnesses, on the part of the defendants, do testify that such a resolution was passed. While other witnesses, on the part of the complainants, testify they are positive no such resolution did pass. That such a resolution was introduced, but did not pass, but instead thereof, a resolution was passed exonerating the officers of the company from any criminal intent in the management of the business of the company.

We regard the clear preponderance of the evidence to be against the passage of any resolution of ratification, and fixed no satisfactory proof in the record of any ratification, at this meeting, of the contract or transactions in question.

It is then contended, that the committee appointed at that meeting were, by the resolutions of appointment, authorized to, and did, fully settle with Cushman & Hardin, and release them from all liability on account of the transactions in question.

These resolutions are set out in the record. The first one names the persons who are appointed a committee " to adjust the affairs of this company upon such equitable conditions as, in the opinion of said committee, will best promote the interests of the stockholders of said company."

The second resolution provides, " that if, in the opinion of the committee, the condition of the company be found such as to require it to be wound up, then the committee is authorized to collect the assets and to sell the franchises and property of said company, and to make an equitable distribution of the proceeds, after paying the debts of the company, and re-insuring the risks of the company."

The third and last resolution provides, that if the committee deem it desirable to continue the business of the company, then they instruct the central board of directors to make an assessment on the stock sufficient to repair the capital.

The committee decided to close up the affairs of the company.

Subsequently there was made the following agreement:

"CHICAGO, ILL., *June 3d*, 1871.

"Whereas, certain controversies and claims exist between Cushman & Hardin, and I. H. Hardin, of the one part, and the Lamar Insurance Co. of the other part, growing out of a contract made by Cushman & Hardin with said company, dated September 17, 1869, and also growing out of advances made by said Cushman & Hardin to said company, and the withdrawal of the same; and also in reference to the salary of I. N. Hardin as vice-president of said company; and whereas a settlement of all such business is essential to an adjustment of the business of the company, without great injury and loss to the company; it is hereby mutually agreed between the Lamar Insurance Co., through this committee, and I. N. Hardin, that said Hardin shall be allowed to retain the amount he has already drawn as salary, to-wit: $4,940, and shall waive and release all further claims to said company for any additional amount; and in consideration of such release, and of co-operation and aid of said Hardin and said Cushman & Hardin, to be rendered in the settlement of the affairs of the company, it is hereby mutually agreed that this shall be in full settlement of all differences and liabilities of the company to said Cushman & Hardin and said Hardin, and of said Cushman & Hardin and said Hardin to said company; this being intended mutually to be a full settlement of liabilities existing between said parties to this date, except as stockholders of said company."

Signed by the committee, Cushman & Hardin, and I. N. Hardin.

Respecting the circumstances under which the agreement was made, one of the committee says, "we all agreed that it (the business of the company) should be closed in one of two ways. One was, to bring suit against Cushman & Hardin; in which event, it was conceded, we could not re-insure, as the best mortgage which the company had, about $67,000, was upon Hardin, and we could not negotiate that mortgage while

quarreling with Hardin. The other was, to effect a settlement with Cushman & Hardin, and re-insure, which was eventually done and these papers executed."

It appears that Hardin had borrowed $67,000 of the company's money, practically about all the money the company had; that the securities Hardin had given for the money were not due and were not in proper form to be negotiated, and that Hardin refused to pay them or to assist in their negotiation, unless the claims against Cushman & Hardin were first released.

The business of the company was suspended under the direction of the committee, its liabilities running on and losses likely to occur; and from the evidence and the recitals of the agreement, it was a necessity of the situation to comply with the demands of Hardin, or of Cushman & Hardin. Cushman was treasurer of the company, and Hardin was the managing partner of the banking house of Cushman & Hardin, in which, it was stipulated by the contract of September 17, 1869, all the funds of the company should be deposited, and Hardin was the vice-president of the company and a director. Hardin himself says, that he was elected vice-president in the spring of 1870; that the office was thrust upon him, and further says, " I took no active part in the management of the company." There is no evidence that he was to have any salary. The committee agree that he shall retain the amount he has already drawn as salary, to-wit: $4,940; and he agrees to waive his claims for any further amount; and what the company secured by that waiver was really the only consideration for the pretended surrender of a claim against Cushman & Hardin, for moneys and securities wrongfully withdrawn from the assets of the company, to the amount of $110,000, and their liability as stockholders in respect of $550,000 of stock. This agreement is not under seal. Considering the relations of Cushman & Hardin to the company, and the duties thereby devolved upon them, it can not be said that the company or the stockholders really received any consideration for the execution of the

paper which is here set up as a sufficient discharge of all existing claims upon Cushman & Hardin.

It is claimed that the first one of the above resolutions gave to this committee full power to make the settlement of these claims against Cushman & Hardin in this manner; it is said that it is almost impossible to conceive language which would confer more ample power in regard to the settlement of disputed matters, than is thereby conferred; that the second resolution contains no limitation upon the power conferred by the first, but confers additional power.

But we regard the first resolution as rather one naming the general purpose for which the committee are appointed.

When the committee had decided to close up the affairs of the company, we think their powers under the resolutions were such only, as were conferred upon them by the second resolution, which specifically provides what they shall do, in the event they find the company in such condition as to require it to be wound up. The authority, in that case, is specific and definite, viz: To collect the assets and to sell the franchises and property of said company, pay the debts, re-insure the risks, and make equitable distribution of the surplus amongst the stockholders.

If Cushman & Hardin had improperly withdrawn from the company money or securities to the amount of $110,000, that sum was owing by them to the company, and was an asset, which the committee was authorized to collect. The authority to collect and distribute does not embrace the power to release without payment. The courts have repeatedly held, that an attorney, intrusted with a claim for collection, has no power to discharge it without payment in full, and that to compromise a claim under such circumstances, requires a special authority from the principal. *Nolan* v. *Jackson*, 16 Ill. 272; *Vickery* v. *McClellan*, 61 id. 311.

This committee we consider, in the event which happened, had authority to collect the assets of the company, but no power to give them away, or release them without payment.

The point is made by counsel for plaintiffs in error that the

30—80TH ILL.

paper itself does not express a release of this claim against Cush-
man & Hardin, for their liability as stockholders is expressly
excepted by the concluding words, " *except* as stockholders of
said company." But we lay no stress upon that, as they were
admittedly stockholders to the amount of $55,000 of other
stock, and we have no doubt the exception has reference to
that stock only.

We regard this agreement of release as one which should
not be sustained in a court of equity, and that it can not be
set up in discharge of the liability of the defendants.

It is urged, that from the delay in bringing this suit, the
complainants should be held to have acquiesced in the settle-
ment made by the directors, or the committee appointed at the
stockholders' meeting of 1871. The bill was filed July 31,
1873. We find nothing, in this respect, which should pre-
clude the entertaining of the bill.

It is objected, that these complainants can not, in this suit,
control and hinder the receiver appointed in the suit of the
creditors' bill, from collecting of the stockholders (among
whom are the complainants) the sums due to the creditors of
the company. We shall not assume to do so, but only to pro-
nounce upon the claim of liability preferred in this bill of
complaint.

In regard to the claim for $70,000, set up in the bill, we do
not understand it to be seriously pressed by counsel for plain-
tiffs in error that there is any liability on the part of Cushman
& Hardin in respect to that. The evidence shows it to have
been a loan to the company and repaid. The fact, that it might
have been placed in the hands of the company in order that a
better showing might be made to the Auditor than the real
condition of the company warranted, is no ground, that we can
see, upon which these complainants can found any claim of
liability in their favor against Cushman & Hardin.

It follows, from what has been said, that this $110,000 was
wrongfully withdrawn by Cushman & Hardin from the com-
pany, and should be refunded by them; that the cancellation
of the 55,000 shares of stock, issued to Cushman & Hardin,

should be disregarded, and they still be regarded as stockholders in respect to such stock; and in any assessment upon the stock of the company, those shares should be assessed equally with all the other stock. The decree, so far as respects Cushman and Hardin, will be reversed, and the cause remanded for further proceedings in conformity with this opinion.

*Decree reversed.*