ALBERT W. NICKERSON *vs.* JOSEPH M. ENGLISH.

Suffolk. Jan. 12, 13. — July 3, 1886. DEVENS & GARDNER, JJ., absent.

A. signed a subscription paper, whereby he and the other subscribers agreed to contribute the amounts set opposite their names for the purpose of purchasing the property of a mining corporation. As part of the same transaction, the promoter of the scheme secretly agreed, on behalf of the corporation, to give A. a certain number of shares of stock free of cost. This was to induce A. to be a subscriber, and to influence others to sign; and some of those who afterwards subscribed were in part induced to do so by seeing that A. was a subscriber. Subsequently, the scheme was given up, because enough subscribers were not obtained to buy the entire property, and another scheme was set on foot by the promoter, by which the persons who signed the former paper were to take shares of stock in the company. A. refused to have anything to do with it unless he could have the same advantage he would have derived had the prior arrangement been carried out; and the promoter agreed to this. No new papers were drawn up, and A. acted with the other subscribers to the original paper in carrying out the new scheme, apparently on an equality with them, and intending that his subscription should be used to secure this result. *Held,* in an action brought by A. against the promoter of the scheme to recover the value of the shares of stock secretly bargained for, that these facts would warrant the jury in finding that the new secret agreement was void as in fraud of the other subscribers.

CONTRACT. Writ dated May 27, 1881. The declaration alleged that, on or about November 26, 1880, the defendant agreed that, if the plaintiff would pay him $10,500, he would deliver to the plaintiff forty-five hundred shares of stock in the Napa Consolidated Quicksilver Mining Company; that the plaintiff paid said sum to the defendant, and received from him three thousand shares of said stock; and that the defendant refused to deliver the remaining fifteen hundred shares.

The answer contained a general denial, and, in addition to other defences which need not now be stated, averred " that, if any such contract or transaction as is alleged was ever made or entered into between the plaintiff and the defendant, said contract was illegal and void, and was a fraud upon other purchasers of said stock."

At the trial in the Superior Court, before *Brigham,* C. J., the evidence tended to show that, in May, 1880, the defendant, who at that time owned a large amount of stock in the Napa Consolidated Quicksilver Mining Company, and who assumed to be able to control the rest of the stock, made an arrangement with one

Landers to assist him in selling the entire stock of the company. They employed the firm of Humbert and Company, mining engineers in Boston, consisting of Pierre Humbert, Jr. and John R. Humbert, as agents to sell the stock. They drew up a subscription paper, dated August 5, 1880, which was signed "Napa Consolidated Quicksilver Company, per Humbert & Co., Agents," the terms of which appear in the opinion. The plaintiff was the second subscriber on this paper, to the amount of $10,500, and Pierre Humbert, Jr. obtained his subscription by giving him an agreement, dated August 7, 1880, signed in the name of the "Napa Consolidated Quicksilver Company, per Humbert & Co., Agents," and which was in these words: "This is to certify that A. W. Nickerson is entitled to fifteen hundred shares Napa Con. Quicksilver Co. above his subscription free of cost on placement of property."

There was conflicting testimony as to how far the scheme represented by the subscription paper of August was abandoned. There was evidence that at a certain time the defendant told Humbert and Company that the subscription paper must be withdrawn or abandoned, and that from that time forward shares in the capital stock of the company were to be disposed of instead of taking subscriptions for the purchase of the property of the company; and Pierre Humbert, Jr. testified that the plaintiff said to him: "You need not expect me to take and buy any shares in the new arrangement, unless you carry out the old agreement. I won't pay my money in unless that be understood." The witness further testified, that he reported this to the defendant, and the defendant authorized him to see the plaintiff, and say to him, that, if he would pay immediately $10,500, the defendant would give him forty-five hundred shares of stock; and that he told this to the plaintiff. The defendant denied that he said so to Humbert. On November 22, the plaintiff paid $10,500, and received a certificate of three thousand shares of stock, together with $1200, the amount of dividends declared by the company from August 5 to November 26 on said three thousand shares.

The jury returned a verdict for the plaintiff, in the sum of $5906.25; and the defendant alleged exceptions, which appear in the opinion.

*N. Morse & E. W. Hutchins,* for the defendant.

*R. D. Smith & C. A. Prince,* for the plaintiff.

FIELD, J.   The defendant relies upon his exceptions to the exclusion of evidence offered by him, and to the refusal of the judge to give the instructions to the jury which he requested.

Whether the agreement of August 5, 1880, was ever binding upon the Napa Consolidated Quicksilver Company or not is, we think, immaterial, because the action is not against the company, or on that agreement.   It may be, as the judge below suggested, that there was no evidence that the defendant was authorized by that company to execute any such agreement in its name, either by himself or by any agents he might appoint.   That paper is material only so far as it entered into the agreement for the purchase and sale of stock which was actually carried out.   By the agreement of August 5, the company was to sell all its corporate property for the sum of $350,000, and the subscribers agreed to pay the sums set against their names, provided the title to the property was clear and unincumbered, and its condition and value were found to be as set forth in certain reports; and provided also that all the moneys then in the treasury of the company, or thereafter received, should be paid over to the subscribers as a part of the purchase.   The subscribers also agreed " that in all things necessary for the fulfilment of this agreement herein set forth, and for the future management of the property, the action of a majority in interest of their number shall be binding."   Nineteen persons, of whom one signed twice, subscribed to this agreement, each for a definite sum of money, in all amounting to $124,000, and two other persons subscribed for shares, in all amounting to five thousand shares, and there was an additional subscriber, the last, who subscribed $3500.   It is said that the last three subscribed after it was decided by the defendant that no more signatures to the agreement were to be obtained.

The company was a corporation organized under the laws of the State of California, with a capital stock of one hundred thousand shares of the par value of $100 each.   The plaintiff subscribed the agreement for $10,500, and was the second subscriber; and, at the time he subscribed, he received the agreement dated August 7, 1880.

The plaintiff declares on an oral agreement, alleged to have been subsequently made with the defendant, to buy of him forty-five hundred shares of stock for $10,500. It is not denied by the defendant, that the attempt to obtain additional subscriptions to the original agreement ceased before the requisite number of subscribers had been obtained, and that he directed that it should no longer be circulated for subscriptions, because he did not want to give new subscribers the back dividends. The plaintiff contends that the whole original scheme was abandoned by all the parties to it, and that an independent attempt was made to sell shares of stock in the company, subject of course to a delivery of the control to the Boston parties or no sale, and that this was the only arrangement ever carried into effect.

There was evidence that the new arrangement for selling stock was that it was to be sold at $3.50 per share, and that the subscribers to the original paper who took shares at that price were to receive the back dividends, but that new subscribers to stock were not. There was also evidence that the plaintiff refused to take stock under this arrangement unless the agreement with him of August 7, 1880, was carried out, and that the defendant authorized Humbert to promise that this should be done, or that the plaintiff should receive forty-five hundred shares for $10,500, and that Humbert made this promise to the plaintiff, and thereupon the plaintiff paid $10,500 and received three thousand shares of stock with the back dividends, and now sues to recover the value of fifteen hundred shares which the defendant refuses to convey to him.

The defendant's contention is, that the original subscription paper was not abandoned, but that it was orally agreed between the subscribers to it, that, instead of attempting to obtain subscriptions to the full amount, and then taking a transfer of all the property of the corporation, the subscribers should take stock to the extent of their subscription at $3.50 per share, and receive the back dividends, and that other persons should be induced to buy stock, at $3.50 a share, until a controlling interest in the stock was sold; that this arrangement was carried out; and that the plaintiff is suing upon the original agreement for fifteen hundred shares as modified by this change, and that the alleged new promise of the defendant was a promise to perform

the original agreement of August 7, as modified by the new arrangement.

The charge of the presiding judge is directed to two questions, namely, whether Humbert on behalf of the defendant made the oral promise declared on, and, if so, whether he was authorized to make it by the defendant; and he considers the original subscription paper as abandoned, and treats that and the original agreement for fifteen hundred shares as of no legal effect upon the rights of the parties.

The plaintiff never signed any other agreement than the original agreement of August 5, and there is no evidence that any of the other subscribers ever signed any other agreement. There was evidence for the jury, that the agreement of August 7 to give the plaintiff fifteen hundred shares of stock was a secret agreement made by the defendant's authority, as the consideration of the plaintiff's signing the agreement to purchase the property of the corporation, apparently on equal terms with the other subscribers, and for thus allowing the use of his name as an inducement to other persons to sign it, and that some did sign it in ignorance of this secret agreement, and influenced more or less by the fact that the plaintiff had signed it. It is not seriously controverted by the plaintiff, that, if the subscription paper had been completed and the plaintiff had brought suit on the agreement of August 7 to give him fifteen hundred shares, there was evidence for the jury that the agreement was illegal and void as against public policy. The real contention of the plaintiff is, that the contract on which he sues was a new and independent contract, made with the defendant and not with the company; that the construction of the written agreements of August 5 and 7 was for the court, and that they both purport to be agreements with the company, and not with the defendant; that the agreement of August 7 was conditional upon "the placement of the property;" that it was conceded that the agreement of August 5 was never signed by the requisite number of subscribers, and was never carried into effect, and that the property was never "placed," within the meaning of the agreement of August 7; that, as matter of law, after the attempt to carry into effect the agreement of August 5 according to its terms was abandoned, no one of the subscribers was legally

bound to purchase any stock of the defendant, and that, if any did so, they made their own terms; and that there was no evidence that the plaintiff authorized the use of his name as a lure or inducement to other persons to buy stock of the defendant, or that he ever signed with others any agreement to buy stock of the defendant, which could have been shown to any person, or, if the old subscription paper was used to induce persons to buy stock, that he authorized this use of the paper, or that it was a use of the paper which was contemplated when he signed it, or which he could be presumed to have anticipated and intended.

We think the court was right in treating the agreement to take stock as a new agreement, which would not be binding on the subscribers to the old agreement unless they actually assented to it, and that it was competent for the parties to agree upon any price for the stock they saw fit; and that, if this were all, no illegality was shown in the contract on which the suit is brought. It is only on the ground that the plaintiff was acting with others in a matter of common interest, and apparently upon an equality with them, and that his signature was used, and intended to be used, to induce other persons to sign the common agreement, that the secret promise for his advantage can be declared void. *Harvey* v. *Hunt,* 119 Mass. 279. *White Mountains Railroad* v. *Eastman,* 34 N. H. 124. *Melvin* v. *Lamar Ins. Co.* 80 Ill. 446. *Robinson* v. *Pittsburg & Connellsville Railroad,* 32 Penn. St. 334. *Miller* v. *Hanover Junction & Susquehanna Railroad,* 87 Penn. St. 95. *Henry* v. *Vermillion & Ashland Railroad,* 17 Ohio, 187. *Stanhope's case,* L. R. 1 Ch. 161.

But a new agreement may be so connected with the original secret agreement as to be tainted with the same illegality. It has been said that, to have this effect, "the connection must be something more than a mere conjunction of circumstances into which the unlawful transaction enters, so that without it there would have been no occasion for the agreement. It must amount to a unity of design and purpose, such that the agreement is really part and parcel of one entire unlawful scheme." Pollock on Contracts, 325, and cases cited. Although the change from the agreement to buy the property of the company to that of buying stock in it was something more than a modification of the original agreement in matters of detail, or in matters

relating to the time or manner of performance, and although the original agreement never became obligatory upon the subscribers, because it was subject to the implied condition that it should not take effect until subscriptions sufficient for the purchase of the whole property of the corporation were obtained, and although the effect of refusing to permit further subscriptions to it was in legal effect abandoning it, yet it might have been incorporated into the new agreement, if the parties to that agreement so determined. If the new agreement to purchase stock from the defendant was substituted for the original agreement to purchase the property of the corporation by the consent of the subscribers, of whom the plaintiff was one, with the understanding that their rights as among themselves were substantially the same as expressed in that agreement, and this change was promoted by the plaintiff or by his authority, and the new arrangement was actually carried into effect, it should have been left to the jury to determine whether both the new and the old promise for a secret advantage were not void, as made in fraud of the rights of the other subscribers who became purchasers of stock. Every subscriber to the agreement to buy the property was at liberty to refuse to take stock, and unless he was induced to take it by the original subscription of the plaintiff, and by the representations of the plaintiff that he assented to the change made and was taking stock on equal terms with the others, no fraud has been practised upon the subscribers.

The offer of evidence by the defendant did not include any offer to show that the plaintiff, by himself or his agent, expressly represented to the other subscribers that he would take stock with the others to the amount of his original subscription, and that they took stock on the faith of this representation. But the offer of evidence, with the evidence admitted, was broad enough to include evidence that the plaintiff agreed with the other subscribers to take stock, instead of the property, to the extent of his subscription, at $3.50 a share, after deducting the back dividends, and upon the basis, as among themselves, of the original subscription. If all the evidence offered had been admitted, there was evidence for the jury that the plaintiff, by himself or his agent, acted with the other subscribers, and apparently upon an equality with them, in effecting the arrangement

whereby they took stock to the extent of their subscriptions, and that he intended that his subscription should be used for the purpose of securing this result.

We think that the case was tried too narrowly, and that, in addition to the evidence relating to the original agreement to give him fifteen hundred shares, evidence should have been admitted tending to show that the plaintiff, personally or by his agent, agreed, expressly or impliedly, with the other subscribers, that he would act with them in taking stock on the basis of the original agreement to buy the property, and that he and Pierre Humbert, Jr., so far as he acted for the plaintiff, understood that the plaintiff's subscription was to be used for the purpose of inducing the other subscribers and other persons to buy stock under the new arrangement, when it was insisted that the defendant should promise that he would give the plaintiff the same advantage as was promised in the first secret agreement.

*Exceptions sustained.*