Argued March 26, decided June 16, 1908.

## WILLS v. NEHALEM COAL CO.

[96 Pac. 528.]

PLEADING—DEMURRER—EFFECT AS ADMISSION.
1. A demurrer admits the truth of what is well pleaded and of every reasonable and proper inference deducible therefrom.

CORPORATIONS — DISSOLUTION — JURISDICTION OF EQUITY — STATUTORY AUTHORITY—NECESSITY.
2. In the absence of statutes enlarging the powers of chancery courts, a court, possessed of chancery powers merely, has no jurisdiction at the suit of a stockholder, to dissolve a corporation and decree its winding up.

SAME—ACTION FOR DISSOLUTION—PLEADING—SUFFICIENCY.
3. A petition in a suit by a stockholder is insufficient to give a court, possessed of chancery powers only, jurisdiction to dissolve the corporation and decree its winding up, where it does not allege any of the jurisdictional facts referred to in Section 1081, B. & C. Comp., providing that a receiver may be appointed in any civil action, other than for the recovery of specific personal property, and in cases provided by statute, when a corporation has been dissolved or is insolvent or in imminent danger of insolvency or has forfeited its corporate rights.

SAME—ORGANIZATION—PROMOTERS—RELATION TO COMPANY.
4. A promoter of a corporation sustains towards the members of the company the relation of a trustee towards a *cestui que trust*, and hence, he will not be permitted to speculate out of the relation or to derive any secret advantages from it, but is bound to disclose to the members of the corporation fully, all material facts touching his relation to them, including the amount which he is to get for his services as promoter.

SAME—PERSONS TO WHOM TRUST RELATION EXTENDS.
5. The promoter of a corporation sustains a trust relation, not only to the present stockholders, but to all persons whom he invites or solicits to purchase

shares in the company, and his intentional omission to disclose facts to intending subscribers is as much fraud as a positive misrepresentation.

SAME—NATURE OF RELATIONSHIP.

6. The trust relationship existing between the promoters of a corporation and its members is twofold: First, towards the corporation as a separate legal entity in respect to corporate property; and, second, to the individual shareholder in respect to his property in his shares.

SAME—ACTION AGAINST PROMOTERS OR DIRECTORS—PARTIES.

7. Where promoters or directors of a corporation violate their duties as trustees for the members by wrongfully dealing with the corporate property or with the corporate franchise, the corporation is itself primarily interested, and must institute and maintain any equitable suits to redress the wrong; but where the acts of the directors are of such a nature that they directly and primarily affect the interests of stockholders in their shares of stock, by diminishing their value or otherwise injuring their proprietary rights in them, then the stockholders are the proper parties to maintain suits to redress the wrong.

SAME.

8. Money or property received by a corporation in payment of stock subscriptions is the property and assets of the corporation, so that any act of the directors in wrongfully disposing of or dealing with such property is primarily an injury to the rights of the corporation for redress from which it must sue.

SAME—SUBSCRIPTION TO STOCK—CONTRACTS OF—RELEASE FROM LIA-
    BILITY ON—POWER OF DIRECTORS.

9. The directors of a corporation have no power, without the consent of the members, to give away funds of the corporation, and hence they cannot, without consent of all the shareholders, release a subscriber from his obligation to pay for his shares according to the contract of subscription.

SAME—PRESUMPTIONS.

10. In an action to compel the surrender to a corporation by one of its promoters and directors of secret benefits alleged to have been received in the form of shares of stock issued to the promoter as fully paid; when in fact it was not paid, it must be presumed, in the absence of allegations as to the terms of the promoter's contract of subscription, that he was to pay for the stock at the time, or in such installments and at such times as might be required by the directors, and that the proper call was made for the full amount thereof.

SAME—RIGHTS OF PROMOTERS—AUTHORITY TO SELL PROPERTY TO COR-
    PORATION—GOOD FAITH OF PROMOTER.

11. A promoter of a corporation may rightfully sell property belonging to him to a corporation which he is organizing, providing he exercises the utmost good faith, complete truthfulness, and careful regard for the protection of future stockholders, and, in order to meet such requirements, he must not only disclose his ownership, but in dealing with the stockholders, he must not be in a position to exercise an unfair influence upon the judgment of the purchasing agents of the corporation.

SAME—OFFICERS OF THE CORPORATION — SECRET PROFITS—ACTION TO
    COMPEL SURRENDER OF PLEADING.

12. In a suit to compel a director of a corporation to surrender secret profits received by her in the form of shares of stock issued to her as fully paid, when nothing in fact was paid for them, the complaint alleged that she subscribed for 750 shares of stock of the par value of $75,000, which liability

was attempted to be liquidated by a transfer by her to the corporation of land for a consideration of $87,000, which was paid for by the issuance to her of the 750 shares of stock and the corporation note for $12,000, which note was subsequently paid. The complaint further alleged that the value of the land transferred was only $12,000, which was the sum she paid for it, and that, out of the board of five directors, the promoter who subscribed the 750 shares, which was just half of the entire capital, was one, her husband, who had one share, was another, and that two other directors had but one share each. The petition further alleged that the transfer of the land by the promoter to the corporation was only colorable, and that she and the other promoters had previously secured from the owner an option to purchase the land for $12,000, on which they paid $400, which amount they received from a subscriber of stock in payment for the shares subscribed for by him. *Held*, that the essence of the complaint was not merely that the promoter sold the corporation, at an unfair price, property that lawfully and fairly belonged to her, but that the corporation had, through a colorable and circuitous transfer of the title, been compelled to pay $87,000 for land that it was legally and equitably entitled to purchase for $12,000.

SAME—ACCOUNTING BY OFFICER.

13. Where a promoter of a corporation has a secret contract for the purchase of property, the terms of which are more favorable than those disclosed by him to the stockholders, or an agreement that he shall have stock in the corporation without paying therefor, any advantage which he thereby obtains is a fraud on the other stockholders and upon the corporation, for which he may be compelled to account without rescission of the contract.

SAME—RIGHTS OF STOCKHOLDERS—PURCHASERS AFTER ORGANIZATION.

14. Where promoters of a corporation deal as individuals with the corporation to their own advantage and in excess of their legitimate powers, the contractual rights of stockholders of the corporation are by relation coextensive with the legal existence of the corporation, though they subscribed and paid for their stock subsequent to the organization and subsequent to the · wrongful acts of the promoters, and unless, at the time they made their subscriptions and payments for their stock, they were advised of the unlawful acts complained of, they may be considered dissenting stockholders.

SAME—SUING IN NAME OF CORPORATION—COMPLAINT.

15. Where, in an action by stockholders to compel the surrender of secret profits to the corporation by one of the promoters and directors, the complaint charges facts showing that the promoter alleged to have received the secret profits and her husband were two of the five directors and controlled a majority of the stock, it shows that a demand upon the corporation to bring a suit would have been nugatory, so that the action could be maintained by the stockholders without averring a demand on the corporation or any similar proceeding on the part of the stockholders suing.

SAME—PLEADING—SUFFICIENCY.

16. In an action by stockholders to compel the surrender of secret profits to the corporation by one of the promoters and directors, the complaint was not insufficient, though failing to allege that, when plaintiffs purchased their stock, they knew that the promoter alleged to have received the secret profits, or any one else, had subscribed for any stock, nor that they were misled by her acts or those of directors or by their failure to disclose material information, where it did allege that the corporation had been organized, since, before that could be done in compliance with statute, 50 per cent. of the stock would have to be subscribed, and it would therefore be presumed that they were misled.

EQUITY—LACHES—ELEMENTS OF—KNOWLEDGE—DELAY.

17. Full knowledge of all the facts concurring with a delay for unreasonable length of time, are the essential elements of the defense of laches, and laches does not begin to run until knowledge is shown to exist.

SAME—CONSTRUCTION OF PLEADINGS—PRESUMPTIONS FROM.

18. Where a complaint, in an action by stockholders against the promoters and directors of a corporation for fraud, showed that the complaint was filed in September, 1905, and showed that the alleged fraud was committed in September, 1901, but was entirely silent as to when knowledge of the facts came to plaintiffs, and alleged that the officers of the corporation refused to permit plaintiffs to inspect the corporate books, it would not be presumed that plaintiffs had knowledge of the facts during all the four years or of any particular part thereof so as to render them guilty of laches, since any inference as to means of knowledge is repudiated by the allegation of refusal to permit inspection, and, further. because constructive notice or knowledge does not apply to a cause of fraud and cannot relieve a party responsible for fraud.

SAME—ELEMENTS—DELAY—PREJUDICE TO PARTY COMPLAINING.

19. Mere delay is not of itself laches, but the delay must have worked injury to another.

SAME—PLEADING—PRESUMPTIONS OVER.

20. Where laches is not apparent upon the face of a complaint, though the complaint shows a delay in the commencement of the suit unaccompanied by circumstances derogatory of its equity, it is not incumbent upon plaintiff to explain the delay.

From Clatsop: THOMAS A. McBRIDE, Judge.

Statement by MR. COMMISSIONER SLATER.

On September 10, 1901, the defendant corporation was organized with a capital stock of $150,000, divided into 1,500 shares of the par value of $100 each, for the purpose of developing and working coal mines in this state. W. H. Copeland, who had subscribed for one share; Mrs. M. S. Copeland, who subscribed for 750 shares and is the former's wife; W. J. Cook, R. V. Jones, each of whom subscribed for one share, and one other unknown person were elected directors thereof, and have ever since continued in that office. Prior to the legal organization of the company, 14 additional shares of stock had been subscribed by four other persons, the statement of whose names is immaterial. The above-named persons, who were afterwards elected directors of the corporation, had secured from August C. Kinney and his associates an option to purchase a large tract of land, supposed to contain coal, for the complete purchase price of $12,000

to be thereafter paid, and paid therefor the sum of $400, which latter sum had been paid to them by one John Nordstrom for four shares of stock for which he had subscribed. After the articles of incorporation had been filed, and on September 10, 1901, the promoters of the corporation caused the vendors to convey this land to Mrs. Copeland, who immediately conveyed it to the corporation for a pretended consideration of $87,000, which was paid by issuing to her 750 shares of the capital stock of the corporation as paid in full, and by giving the corporation's note for $12,000, which was afterwards paid. The land so conveyed was, at the time, well known to Mrs. Copeland and the other directors, to be worth no more than $12,000, and it never has since that time been worth more than that amount. The company still owns the land, and Mrs. Copeland the 750 shares of stock. After the conveyance of the property, the company continued to receive subscriptions to its capital stock, without making known said transaction, but secured subscriptions by and through its active fraudulent concealment thereof, and by keeping the same a secret from those who afterwards subscribed. After September 10, 1901, and during that year, each of the plaintiffs, without notice or knowledge of the transaction between the corporation and Mrs. Copeland, severally subscribed for and paid to the corporation the par value of their stock, aggregating 42 shares, which they still own. In all, there had been subscribed and taken no more than 1,060 shares.

The foregoing is the substance of the material facts set forth in the complaint; but, in addition, it is averred that those things were done by Mrs. Copeland, W. H. Copeland, her husband, and the other promoters and directors of the corporation, in pursuance of a conspiracy and fraudulent combination among them, to secure one-half of the capital stock of the corporation to Mrs. Cope-

land without paying any consideration therefor; that the corporation was organized for fraudulent purposes and to defraud the minority and all stockholders subsequent to the original stockholders. The prayer is: (1) For a preliminary order restraining Mrs. Copeland from transferring, incumbering or otherwise disposing of her stock pending the suit; (2) for the appointment of a receiver for the assets and property of the corporation and the winding up of its affairs and for distribution; and (3) that Mrs. Copeland be required to pay to the corporation the difference between the actual value of the Kinney lands, on the one hand, and the par value of 750 shares of stock and $12,000 received by her, on the other hand, and that the Nehalem Coal Co. have judgment against her for that amount, or in case that cannot be done, or should that be inequitable, and Mrs. Copeland still holds said stock, that the same be canceled and surrendered to the court. Each of the defendants severally demurred to the complaint on the ground, first, that the court did not have jurisdiction of the subject-matter of the suit, and, second, that the complaint fails to state a cause of suit. Upon the demurrers being sustained and plaintiffs declining to plead over, a decree was entered dismissing the suit, from which plaintiffs appeal.

REVERSED.

For appellants there was a brief and oral arguments by *Mr. John H.* and *Albert M. Smith.*

For respondent there was a brief and an oral argument by *Mr. George C. Fulton.*

Opinion by MR. COMMISSIONER SLATER.

1. Nothing was claimed by the defendants under the first assignment of the demurrers, but the issues presented by the briefs and arguments of counsel refer wholly to the second assignment, and the sole question is: Are there sufficient facts alleged to entitle plaintiffs

to any equitable relief? The demurrer admits the truth of what is well pleaded and of every reasonable and proper inference deducible therefrom. No facts are alleged, however, upon which an equity court may appoint a receiver for the assets of the corporation and wind up its affairs.

2. In the absence of statutes enlarging powers, the general rule is, that a court possessed of chancery powers merely, has no jurisdiction at the suit of a stockholder, to dissolve a corporation and decree its winding up, for the misuser or nonuser of its franchise, or for other cause.

3. It is provided, however, by Sec. 1081, B. & C. Comp., that "a receiver may be appointed in any civil action, suit or proceeding, other than for the recovery of specific personal property: * * (4) In cases provided in this Code, or by other statutes, when a corporation has been dissolved or is insolvent, or in imminent danger of insolvency, or has forfeited its corporate rights." But none of these jurisdictional facts have been alleged.

4. The main purpose of this suit, however, is to compel a surrender of secret profits to the corporation by one of its promoters and directors, which, it is alleged, she received in the form of shares of stock issued to her as fully paid, when nothing in fact was paid for them. This is sought to be accomplished by canceling the stock or by enforcing payment to the corporation of the par value thereof by the person holding the stock. "The principle upon which courts of equity proceed in these cases is a very familiar one. The promoter of a company, like its directors, is deemed to sustain towards the members of the company the relation of a trustee toward his *cestui que trust.* This being so, he will not be permitted to speculate out of that relation, or to derive any secret advantages from it. He is bound to disclose to them fully all material facts touching his relation to

them, including the amount which he is to get for his services as promoter": 1 Thompson Corporation, § 457.

5. This confidential relationship extends not only to present stockholders, but to persons whom they invite or solicit to subscribe for or purchase shares in the company, and their intentional omission to disclose facts to intending subscribers is as much fraud as a positive misrepresentation: 14 Am. & Eng. Enc. Law (2 ed.) 78.

6. This trust relationship, however, is necessarily two-fold: Towards the corporation, as a separate legal entity in respect to corporate property, and towards the shareholders, in respect to his property right in his shares: 3 Pomeroy, Equity, § 1090.

7. Whenever the breach of trust consists in a wrongful dealing of any kind, or manner, with corporate property or with corporate franchise, the corporation itself is primarily interested and must institute and maintain any equitable suit to redress the wrong, while, on the other hand, whenever the acts of the directors are of such a nature that they directly and primarily affect the interests of stockholders in their shares of stock, by diminishing its value, or otherwise impairing their proprietary rights in it, then the stockholders are directly injured and are primarily interested.

8. Money or property received by a corporation in payment of stock subscribed and money due for stock subscribed is the property of the corporation, and constitutes its assets, and therefore any act of the directors unlawfully disposing of or dealing with such property is primarily an injury to the rights of the corporation.

9. They have no power, without the consent of the beneficiaries in the trust, to give away the trust funds. They cannot therefore release a subscriber from his obligation to pay for shares according to the contract of subscription without the consent of all the shareholders, so as to make the release a good one as against them: 2 Thompson, Corporations, § 1580.

10. It is alleged that Mrs. Copeland subscribed for 750 shares of stock, and as a legal consequence she thereby became liable for payment to the corporation in money or money's worth to the amount of the par value thereof. As the terms of the contract of subscription have not been alleged, it must be assumed that the same were to be paid for at the time or in such installments and at such times as may be required by the directors of the corporation (*Hawkins* v. *Donnerberg,* 40 Or. 97: 66 Pac. 691, 908), and that a proper call was made for the full amount thereof. This liability was attempted to be liquidated and canceled by an alleged colorable transfer of land to the corporation, for a consideration of $87,000, which was paid to her by the issuance and delivery to her of 750 shares of stock as fully paid, and the giving of the note of the corporation for $12.000. If the issuance of the stock as fully paid was wrongful, it was an injury to the rights of the corporation. and therefore the right of action is in the corporation, in the first instance, to redress the wrong.

11. It is alleged that the land transferred was purchased by the Nehalem Coal Co. from the defendant M. S. Copeland, which statement would imply that she was the legal and equitable owner of it, and, that being so, she might rightfully sell to the company, provided she exercised the utmost good faith, complete truthfulness, and a careful regard for the protection of future stockholders. To meet such a requirement it was necessary not only that she disclose her assumed ownership, but in dealing with the directors she must not be in a position to exercise an unfair influence upon the judgment of the purchasing agents of the corporation. "The test therefore of the validity of such transactions," says Mr. Justice FINN, in *Yale Gas Stove Co.* v. *Wilcox,* 64 Conn. 101 (29 Atl. 303: 25 L. R. A. 90: 42 Am. St. Rep. 159), "is that it must, in all its parts, be open and fair, so that

the promoters shall not in fact substantially 'act both as vendors and vendees, and in the latter capacity approve a transaction suggested by them in the former.' ": *Stanley* v. *Luse,* 36 Or. 25 (58 Pac. 75). In *Erlanger* v. *New Sombrero Phosphate Co.* L. R. 3 App. Cases, 1218, a leading English case, the Lord Chancellor said of promoters: "They stand, in my opinion, undoubtedly in a fiduciary position. They have in their hands the creation and molding of the company; they have the power of defining how, and when, and in what shape, and under what supervision, it shall start into existence, and begin to act as a trading corporation. If they are doing all this in order that the company may, as soon as it starts into life, become, through its managing directors, the purchaser of the property of themselves, the promoters, it is, in my opinion, incumbent upon the promoters to take care that in forming the company they provide it with an executive—that is to say, with a board of directors—who shall both be aware that the property, which they are asked to buy, is the property of the promoters, and who shall be competent and impartial judges as to whether the purchase ought or ought not to be made. I do not say that the owner of property may not promote and form a joint-stock company, and then sell his property to it; but I do say that, if he does, he is bound to take care that he sells it to the company through the medium of a board of directors who can and do exercise an independent and intelligent judgment on the transaction, and who are not left under the belief that the property belongs, not to the promoter, but to some other person."

12. The complaint alleges that, out of a board of five directors, Mrs. Copeland, who subscribed 750 shares, was one, her husband, who had one share, was another, and that two other directors had but one share each. When it is considered that Mrs. Copeland held just one-

half of the authorized stock, and with her husband a
majority thereof, and the bulk of all capital subscribed
at the time of the organization, the statement of these
facts, taken in connection with the further averment that
the land, the original cost of which was but $12,000,
was conveyed to the corporation for the sum of $75,000
in excess of the cost, and that the land was not worth
more than the original cost, is sufficient to impeach the
good faith of the promoters. Assuming that Mrs. Cope-
land was the owner of the land, at the time she conveyed
it to the company, the actual value of it, as compared
with the consideration received by her from the com-
pany, would be an important and material element in
determining the *bona fides* of the transaction. But, in
our view, the complaint is much broader than merely
charging the sale of property by Mrs. Copeland to the
corporation at an unfair price. Facts are alleged which,
if true, make Mrs. Copeland not the real owner of the
land, but a mere conduit of the title passing from Kin-
ney to the corporation, a means employed to accomplish
the alleged fraud. It is charged that the sale by Mrs.
Copeland to the corporation was only colorable; that is,
that the promoters, including her, had previously secured
from Kinney and his associates, an option for the pur-
chase of this land at the price of $12,000, on which they
had paid $400, but which latter amount they had received
from one John Nordstrom, for payment of stock in the
corporation they were about to form, for the purpose of
buying this land. If this is true, the option, although
taken in the name of the promoters or of one of them,
was, in fact, for the corporation, and, having been paid
for with corporate funds, in equity was its property.
And so it is alleged that, after the filing of the articles
of incorporation, they caused the property to be con-
veyed by Kinney and his associates to Mrs. Copeland,
who immediately afterwards conveyed the same to the

corporation.  So that the essence of the complaint is not merely that Mrs. Copeland sold to the corporation, at an unfair price, property that legally and fairly belonged to her, but that the corporation has, through a colorable and circuitous transfer of the title, been compelled to pay $87,000 for land that it was legally and equitably entitled to purchase for. $12,000.

13. If two or more persons associate themselves for the purpose of purchasing property, and one of them represents to the others that particular property can be bought for a designated price, which he procures to be paid by the associates, when in truth the purchase is for a less sum, and he has received the difference between the two sums, no doubt he may be compelled to account for such difference, though the property may be worth all that was paid for it.  The same principle applies as against promoters of corporations.  Hence, if any of them has a secret contract for the purchase of property, the terms of which are more favorable than those disclosed by him, or an agreement that he shall have stock in the corporation without paying therefor, any advantage which he thereby obtains is a fraud on the other shareholders and upon the corporation, and he will not be permitted to retain it: *Emery* v. *Parrott,* 107 Mass. 95; *Pittsburg Mining Co.* v. *Spooner,* 74 Wis. 307 (42 N. W. 259: 17 Am. St. Rep. 149) ; *McElhenny's Appeal,* 61 Pa. 188; *Densmore Oil Co.* v. *Densmore,* 64 Pa. 43; *Short* v. *Stevenson,* 63 Pa. 95; *Simons* v. *Vulcan Oil & M. Co.* 61 Pa. 202 (100 Am. Dec. 628) ; *Getty* v. *Devlin,* 54 N. Y. 403; *Getty* v. *Devlin,* 70 N. Y. 504; *Chandler* v. *Bacon* (C. C.), 30 Fed. 538; *Atwool* v. *Merryweather,* 37 L. J. Ch. 35.  And he may be compelled to account for such difference without rescission of the contract: *Yale Gas Stove Co.* v. *Wilcox,* 64 Conn. 101 (29 Atl. 303: 25 L. R. A. 90: 42 Am. St. Rep 159).

But it is urged by the defendants, in support of the demurrer, that the complaint does not charge that the original contract price for the land and the manner of its procurement was kept secret from the directors and others, who were stockholders at the time; but with full knowledge of the facts the 750 shares of paid-up stock were issued to Mrs. Copeland, and, no one objecting, the matter became executed and binding on the company, so that it was forever barred from questioning the legality of it, and, the corporation being barred, no one else, it is argued, can maintain a suit in the name of the corporation for its benefit. In the same connection, and as a part of the same argument, they also urge that the plaintiffs, not being stockholders at the time, cannot complain against such prior transaction. A number of cases are cited to support the latter contention, but we think none of them are in point here. It has been established as a rule of practice in the federal courts that, a stockholder contesting as *ultra vires* an act of the directors should aver "that he was a stockholder at the time of the transaction of which he complains, or that his shares have devolved on him by operation of law": *Dimpfel* v. *Ohio & Mississippi Ry. Co.,* 110 U. S. 209 (3 Sup. Ct. 573: 28 L. Ed. 121). To the same effect is *Hawes* v. *Oakland,* 104 U. S. 450 (26 L. Ed. 827), and many others might be cited. But it is said in *Parsons* v. *Joseph,* 92 Ala. 403 (8 South. 788) that the principle asserted rests solely upon equity rule No. 94, adopted by the United States Supreme Court, which rule may be found in the preface to volume 104 of the United States Reporter. Morawetz on Private Corporations, at §§ 269, 270, speaking of this rule, says it was evidently designed as a rule of practice merely, and was deemed necessary to guard federal courts from being imposed upon by collusion of parties. To the same effect are *Forrester* v. *B. & M. Min. Co.* 21 Mont. 565 (55 Pac. 229, 353) and

*Winsor* v. *Bailey,* 55 N. H. 218. However that may be, we conceive that the rule contended for has no application to the facts of this case, for plaintiffs, if not in fact, are in legal effect, stockholders at the date of the organization of the corporation for the purpose of challenging, not only the *bona fides* of the promoters and directors of the corporation, when dealing as individuals with the corporation to their own advantage, but also whether they have exceeded their legitimate powers, for as stated by Mr. Justice LAMAR, in *Morgan* v. *Struthers,* 131 U. S. 246, 254 (9 Sup. Ct. 726, 729: 33 L. Ed. 132) : "A corporation has no legal capacity to release an original subscriber to its capital stock from payment of it, in whole or in any part, and that any arrangement with him by which the company, its creditors or stockholders, shall lose any part of that subscription, is *ultra vires* and a fraud upon creditors and the co-subscribers: *Burke* v. *Smith,* 16 Wall. (U. S.) 390, 395 (21 L. Ed. 361) ; *Bedford Railroad Co.* v. *Bowser,* 48 Pa. 29; Green's Brice's Ultra Vires. This doctrine rests upon the principle that the stock subscribed, both paid and unpaid, is the capital of the company, and its means of carrying out the object for which it was chartered and organized. All these cases fall within this principle. In each of them the agreement declared void, had it been carried out, would have diminished the common fund, which is a trust fund for the benefit of the general creditors of the corporation, the stockholders, and all others having an interest therein, and would have been violative of the terms, upon which subscriptions had been expressly made, and under which the trust originated. The corporation would have been damaged in its capital by the loss of the subscriptions, and the co-subscribers would have been damaged by the lessening of their common trust fund." It is said by Messrs. Clarke and Marshall, at Section 397 of their

work on Private Corporations, that: "In the absence of an express provision or agreement to the contrary, persons who have become stockholders in a corporation by subscribing for or purchasing shares, and paying or agreeing to pay for them, have a right to assume that other stockholders have come in on the same terms, and contributed or agreed to contribute a like amount of capital in proportion to their shares, and they also have a right to expect that subsequent subscribers or purchasers will come in on the same terms. Any secret agreement therefore between the officers of the corporation and subscribers or purchasers of shares, although authorized or ratified by a majority of the stockholders, by which such subscribers or purchasers have been permitted to acquire their shares, without payment, or part payment only, or by which they are given the right to withdraw and receive back what they had paid, is a fraud upon subsequent *bona fide* subscribers or purchasers and void as to them. And if the corporation refuses to enforce full payment, or repays what has been paid in, they may maintain a suit in equity on behalf of themselves and other stockholders to compel payment in full or repayment of what has been withdrawn": *Melvin* v. *Lamar Ins. Co.* 80 Ill. 446 (22 Am. Rep. 199) ; *White Mountain R. Co.* v. *Eastman,* 34 N. H. 124; *Blodgett* v. *Morrill,* 20 Vt. 509. In the same section it is further said, in substance, which is sustained by authority, that, if a corporation has issued stock without receiving payment in full in violation of the common-law rights of stockholders, dissenting stockholders may maintain a suit to annul and cancel the same, provided they are not barred by laches or acquiescence. Mr. Thompson, in his work on the Law of Corporations, at Section 1580 (2 Thompson), when considering such agreements as frauds on other shareholders, also says: "The sound rule is believed to be that they cannot do this with the

consent of the shareholders and of the creditors so as to bind future shareholders and future creditors who become such without knowing that the stake on which the corporation does business has been thus frittered away and reduced. It is evidently in this sense that releases of subscribers and sham payments of their subscriptions are said to be 'frauds on the law.' All secret agreements releasing particular subscribers from the obligation of payment, or otherwise attempting to reduce the obligation of their contract, are, then, in the first instance, void as frauds upon other subscribers. This is especially so as to future subscribers, who may be presumed to subscribe on the faith and under the persuasion, so to speak, of the subscription thus released."

14. All subscriptions are presumably upon the same basis, and all shares are entitled to the same benefits and subject to the same burdens. In the subscription of each person, every other subscriber has a direct interest: *Melvin* v. *Lamar Ins. Co.* 80 Ill. 446 (22 Am. Rep. 199) ; *White Mountain R. Co.* v. *Eastman,* 34 N. H. 124. In the latter case it is held that a secret agreement between the parties changing the character of a subscription contract from what it ostensibly is, to the prejudice of others collaterally interested, is a fraud on them, and therefore void, even as between the parties. In an extended note to the case of *Pittsburg Mining Co.* v. *Spooner,* 17 Am. St. Rep. 149, 166, Judge Freeman says: "So if, when the company or corporation is formed, certain allotments of property or stock are given to some of its promoters with the knowledge and the consent of the others, and there is no intention to have any stock put on the market, or to induce any other person to become interested, any one who subsequently obtains shares, with the knowledge of the bonus given to some of the promoters, cannot sustain an action to set it aside. *In re* British Seamless Paper Box Co.,

L. R. 17 Ch. Div. 467. * *" But "if, on the other hand, the formation of a corporation is a scheme to defraud those who may become interested in it, by causing the purchase of property which is, or should be, known to be worthlesss, the promoters who participate therein, and even their solicitors, may be decreed to repay the entire purchase price": *Phosphate Sewage Co.* v. *Hartmont*, L. R. 5 Ch. 394 (46 L. J. Ch. 661). After a full review of the authorities on this point; the learned author comes to the following conclusion: "The authorities already cited establish that the wrong done by promoters may be regarded either as a wrong to the corporation or to the stockholders therein, whether they became such before or after the transaction complained of, if they acted in innocence of the fraud with which it was tainted. Redress may therefore be had either at the suit of the corporation or any of its shareholders. If the suit is by the corporation, it may be either for the purpose of setting aside the purchase or other transaction, or, without setting it aside, the profits thereof may be recovered, or if stock has been issued without payment, or if any other bonus has been improperly received, the suit may be to recover the stock or other bonus, or to compel payment for the stock at the price at which it was authorized to be issued." From these adjudications, which we think are sound, the logical inference is that the plaintiffs, although subscribing and paying for their stock at a time subsequent to the organization and subsequent to the transactions complained of, yet, by relation, their contractual rights with the corporation and with every other subscriber are co-extensive with the legal existence of the corporation, and unless, at the time they made their subscription and payment for their stock, they were advised of the unlawful acts complained of, they may be considered as dissenting stockholders.

15. It is next urged that, the injury complained of being an injury to the corporate property, and not a direct and immediate injury to the stockholder, the suit to redress the wrong must be brought by the corporation, unless it is alleged with particularity that plaintiff had demanded and required of the officers of the corporation that they take steps to redress the wrong, and that they had refused. The former part of this claim may be conceded to be the law, and some authorities are cited that support the latter part; but there is a great variety of judicial expression upon this point. Mr. Pomeroy, at Section 1095 of Volume 3 (3d ed.) of his work on Equity Jurisprudence, has fully discussed this question. He there states the general rule to be that: "Whenever a cause of action exists primarily in behalf of the corporation against directors, officers, and others, for wrongful dealing with corporate property, or wrongful exercise of corporate franchises, so that the remedy should regularly be obtained through a suit by and in the name of the corporation, and the corporation either actually or virtually refuses to institute or prosecute such a suit, then, in order to prevent a failure of justice, an action may be brought and maintained by a stockholder, or stockholders, either individually or suing on behalf of themselves and all others similarly situated, against the wrongdoing directors, officers, and other persons; but it is absolutely indispensable that the corporation, itself, should be joined as a party, usually as a co-defendant." That the plaintiff should allege and prove that application was made to the directors or managing body, and a reasonable notice, request, or demand that they institute proceedings on the part of the corporation against the wrongdoers, and their refusal to do so after such reasonable request or demand, is but a statement of a general rule. There are exceptions to it. "This condition of fact, however, is not indispensable,"

says the same author. "The action may be maintainable
without showing any notice, request, or demand to the
managing body, or any actual refusal by them to prose-
cute; in other words, the refusal may be virtual. If the
facts as alleged show that the defendants charged with
the wrongdoing, or some of them, constitute a majority
of the directors or managing body at the time of com-
mencing the suit, or that the directors or a majority
thereof are still under the control of the wrongdoing
defendants, so that a refusal of the managing body, if
requested to bring a suit in the name of the corporation,
may be inferred with reasonable certainty, then an
action by a stockholder may be maintained without alleg-
ing or proving any notice, request, demand, or express
refusal. In like manner, if the plaintiff's pleading dis-
closes any other condition of fact which renders it rea-
sonably certain that a suit by the corporation would be
impossible, and that a demand therefore would be nuga-
tory, the action may be maintained without averring a
demand or any other similar proceeding on the part of
the stockholder plaintiff."

This exemplification of the rule appears to be sus-
tained by the great weight of authorities, English and
American, which have been elaborately cited by the
author in an extensive footnote to the above section. The
few cases cited by defendants in opposition to the excep-
tion to the rule are mainly from the Supreme Court of
the United States. These, and particularly *Hawes* v.
*Oakland,* 104 U. S. 450 (26 L. Ed. 827) are there dis-
cussed and analyzed. The specific and extraordinary
allegations demanded by those cases are intended, it is
there said, to guard the federal jurisdiction from en-
croachment, and are prescribed by a rule of that court
for the purpose of preventing collusive attempts to bring
causes within that jurisdiction. The complaint here
charges the alleged fraud against all of the then direct-

ors who have ever since continued in that office, and of whom the chief beneficiary of the alleged fraud, Mrs. Copeland, and her husband, are members, being two out of five. When it is considered that each of two others have but one share, and that Mrs. Copeland held the great bulk of the subscribed stock, it becomes apparent that she and her husband must have exercised complete control in the election and organization of the board, as well as over its subsequent acts and disposition to act. Under such circumstances, a demand by plaintiffs would have been futile, and a virtual refusal to sue must be considered to have existed.

16. It is also urged by defendants that the complaint fails to allege that when plaintiffs purchased, they knew that Mrs. Copeland, or any one, had subscribed for any stock, nor that they were misled by any of her, or of the directors, or by any failure on their part to disclose material information. But it is alleged that the corporation had been organized, and before that could be done, to comply with the statute, 50 per cent of the stock must have been subscribed, and it seems it will be presumed that they, and other stockholders in their situation, were so misled: 2 Thompson, Corporations, § 1581; *Melvin* v. *Lamar Ins. Co.* 80 Ill. 446 (22 Am. Rep. 199).

17. It is asserted by defendants that the complaint shows that for fully four years prior to the institution of this suit plaintiffs had full notice and knowledge of the grievances complained of, and from this it is argued that they are guilty of such laches that must defeat the suit. Full knowledge of all the facts concurring with a delay for an unreasonable length of time are the essential elements of the defense of laches. Until knowledge is shown to exist, the beginning of time from which laches will run cannot be said to commence: 2 Cook, Corporations (4th ed.) § 731.

18. But counsel are in error as to what the complaint does show. It was sworn to and filed on September 28, 1905, and shows that the alleged fraud was committed on September 10, 1901; but it is entirely silent as to when knowledge of the facts set forth therein came to the plaintiffs. Under the circumstances of this case, we are not bound to presume that plaintiffs had knowledge during all of the four years or for any particular part thereof. The rule, if such is the rule, that, when the means or knowledge are open to the stockholder, he is chargeable with knowledge, from the date when he should have ascertained the facts, cannot be applied here for two reasons: First, because the means of knowledge is rebutted by the averment, that the officers and directors have refused to permit the stockholders to examine the books of the corporation; and, second, because constructive notice or knowledge does not apply to a case of fraud and cannot relieve a party responsible for fraud: *Converse* v. *Blumrich,* 14 Mich. 109 (90 Am. Dec. 230) ; 2 Cook, Corporations, § 731.

19. The real question here is whether, as a matter of pleading, it is incumbent on plaintiff to explain mere delay, such as appears here, unaccompanied by any circumstance derogatory of their equity. The general rule is that, where there had been apparent laches in the prosecution of a suit in equity, it is incumbent upon the plaintiff, in order to repel the presumption of laches or unreasonable delay, to set up in his bill the reasons why the suit was not brought at an earlier period, stating specifically, what were the impediments to an earlier prosecution of the claim: 12 Pl. & Pr. 834; *Neppach* v. *Jones,* 20 Or. 491 (26 Pac. 569, 849: 23 Am. St. Rep. 145). But, as we have said, laches is not apparent upon the face of the complaint, for mere delay of itself is not laches, but delay that has worked an injury to another: *Neppach* v. *Jones, supra; Wilson* v. *Wilson,* 41 Or. 459 (69 Pac. 923: 12 Am. & Eng. Enc. Law (2 ed.) 533).

20. In such cases, courts of equity are also said to act by analogy to the statutory limitations of actions at law, and there is sound authority for the rule that when suit is brought within the time fixed by the analogous statute, the burden is on defendant to show the existence of circumstances amounting to laches.    When, however, the suit is brought after the statutory time, plaintiff must plead and prove that laches does not exist, and the facts must be specifically and precisely pleaded: 16 Cyc. 180; 1 Pomeroy's Equitable Remedies, § 20.    Nor are we prepared to say at this time that, if knowledge of the acts of the directors for the full period were imputed on the face of the complaint to the plaintiffs without disclosing any injury to the defendants arising from the delay, that of itself would be sufficient to establish laches under the facts of this case: *Montgomery Light Co.* v. *Lahey,* 121 Ala. 131 (25 South. 1006).    But we shall leave the matter to be determined upon all of the facts.

From these considerations, we are of the opinion that the complaint states sufficient facts to entitle plaintiffs to equitable relief by compelling defendant Copeland, either to pay to the corporation the amount found to be due on the stock issued to her, or by cancelling the same according as one or the other may seem to the court to be more equitable when the facts are before it.

The decree should be reversed, and cause remanded, with instruction to overrule the demurrers, and for such further proceedings as may be proper.    REVERSED.