Argued January 2, affirmed as modified April 10, 1968

THE PARK CITY CORPORATION, *Appellant, v.* WATCHIE ET AL, *Respondents.*

439 P. 2d 587

*James H. Clarke,* Portland, argued the cause for appellant. With him on the brief were McColloch, Dezendorf & Spears and Herbert H. Anderson, Portland.

*Randall B. Kester,* Portland, argued the cause for respondents H. R. Watchie, Sheila Watchie, H. R. Watchie & Associates, Inc., and H. R. Watchie, Trustee. With him on the brief were Maguire, Kester & Cosgrave, Robert F. Maguire and William D. Rutherford, Portland.

*James R. Moore,* Portland, argued the cause for respondent Walter R. Lommel. With him on the brief were Mautz, Souther, Spaulding, Kinsey & Williamson, Portland.

Before PERRY, Chief Justice, and MCALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE* and HOLMAN, Justices.

## SLOAN, J.

This is a suit by plaintiff corporation to recover from defendant H. R. Watchie and the other named defendants, alleged secret profits made by Watchie in the sale of certain land to the corporation at a time when Watchie was the promoter of the corporation and in complete control of it. The trial court found for defendants. Plaintiff appeals.

Defendant Watchie is a real estate broker of Seattle, Washington. For the past several years, until the events shortly to be described occurred, he had been a successful finder and developer of property suitable for development into homesites and adjacent recreational areas and shopping centers. The defend-

---

* Denecke, J., did not participate in the decision of this case.

ant Sheila Watchie, his wife, is a nominal party only and will not be mentioned. Defendant H. R. Watchie & Associates, Inc. is a corporation solely owned by Watchie and used by him as a corporate device by which he transacted much of his business. Defendant Lommel is a trustee for a group of Seattle investors.

The pertinent facts are not seriously disputed and may be stated as follows: Defendant Watchie's typical method of operation was to find suitable property and by the use of his own funds, obtain earnest money receipts or options to buy. He would then present the opportunity to buy the property to various persons interested in investing in this type of venture, and when enough people with sufficient money were available to buy the desired property, he would usually acquire title to the property with himself as trustee for the benefit of the investors. The investors would reimburse Watchie for his costs and expenses in acquiring the property. His profit in the transaction would be in the nature of a mark-up in the price of the property to the investors which would be one-ninth of the purchase price. These transactions were usually siphoned through defendant H. R. Watchie & Associates, Inc. The record discloses that this form of group investment or syndicate is somewhat commonly used.

In 1960, Watchie became interested in several tracts of property situated west of Portland near the Sunset highway. The property appeared to have potential for a successful venture of the kind he had previously organized. Typical of his usual procedure, before buying the property, Watchie made extensive surveys of population trends, the availability of utilities and other data that would be significant and important to the potential value and development of the property. He then acquired contracts and options to purchase 965

acres, in several tracts, for the purchase price of $729,000. This property is designated as the Skyline property and is the subject of this litigation.

After acquiring the rights to buy the property, Watchie interested a group of Seattle investors, apparently known as the Seattle Quarterback Club, in buying these tracts of land. We will refer to this group as the Seattle syndicate. After the Seattle syndicate agreed to invest in the Skyline property, Watchie entered into contracts of purchase at the agreed price. He was the named purchaser in the contracts, but his title was that of a trustee. The contracts were recorded in Multnomah county. The members of the syndicate were interested only in holding the property as an investment with the hope of its increase in value so that it could be sold for double what they had paid for it. Accordingly, the terms of Watchie's trust agreements with the members of the syndicate, indicated that the property was not to be sold until he could sell it for double the purchase price of $729,000. This was the only interest of the members of the syndicate, they were not interested in developing the property themselves.

In early 1962, Watchie acquired options to buy approximately 1600 acres of so-called flat land property, which was situate in Washington county, adjacent to the Skyline property. It was intended that these 1600 acres, would be a "core area," in relation to the Skyline property, and would be developed for commercial purposes, such as shopping centers, as well as for residential purposes. At the same time Watchie acquired the latter property he decided to form a public corporation for the purpose of acquiring and developing all of this property, the 1600 acre tract, plus the Skyline property.

In furtherance of this plan he organized plaintiff corporation in April of 1962. Watchie became the president of the corporation and his business associates and employes became the corporation's directors. He notified the members of the Seattle syndicate both of his intention to form this corporation, in which he would be an active participant, and that the corporation would buy the property in accordance with the terms agreed upon at double the price initially paid for the Skyline property. The members of the syndicate agreed to this. Watchie then caused his corporation, H. R. Watchie & Associates, Inc. to execute an earnest money receipt for the purchase of the Skyline property from himself as trustee of the Seattle syndicate, for $1,458,000. The agreement provided for a substantial down payment, the assumption of the original contracts to buy the property, and for deferred payments over a period of time, plus interest. On the same day that H. R. Watchie & Associates, Inc. executed this earnest money receipt it assigned the same to the plaintiff corporation with a one-ninth mark-up or commission to the Associates of $162,000.

At the same time Watchie prepared to sell stock in the corporation in units of $100,000 each. As a part of a plan to sell stock, he prepared a stock subscription agreement that set forth the plans for the development of the property in detail. The subscription agreement provided that the property would be acquired by the corporation at cost plus the commission to H. R. Watchie & Associates, Inc. Some of the persons who became interested in subscribing to the stock, and who did eventually become subscribers were Portland residents. Before executing the subscription agreement one of the Portland subscribers, both for himself and others, made extensive investigation of

the property itself and the nature of the proposed developments, and examined similar developments previously made by Watchie in the Seattle area. He was aware of the actual purchase price of the property and that the corporation was buying several thousand acres, including the Skyline property, at an average price of approximately $1500 per acre. The subscriber did not, however, investigate any of the records of the corporation nor did he examine the recorded contracts executed by Watchie when he initially bought the property for the Seattle syndicate for the $729,000. Watchie did not advise the subscribers that the property had been acquired by the Seattle syndicate two years previously for one-half of the purchase price which the corporation had agreed to pay for the property nor did he advise them of his relationship as trustee for the Seattle syndicate. The Portland subscribers executed subscription agreements in the latter part of 1962 and early 1963.

It should be remembered that during this period of time Watchie held this property by the recorded contracts of purchase as trustee for the Seattle syndicate, subject to the earnest money receipt which we have mentioned. On April 15, 1963, Watchie entered into a contract between himself and the plaintiff corporation, by which the corporation agreed to buy the property in accordance with the terms of the earnest money receipt above referred to. It should also be mentioned that during this period of time extensive plans were proceeding for the development of all of the corporation's property. However, the Skyline property was not included within the immediate plans. It was anticipated that it would be a matter of several years before the Skyline property could be successfully utilized and marketed as home sites. The other property was

developed. Several houses were built and extensive efforts were made to market the houses and building sites. It was, as mentioned, the kind of venture that had been successful elsewhere.

Unfortunately, this venture did not meet with the success that had attended Watchie's previous developments of similar character and other like ventures throughout the country. The illusions of a highly profitable venture rapidly faded. In 1965, Watchie resigned as president and as a director of plaintiff corporation and a group of the Portland subscribers were elected directors. One of them was elected president. Watchie was not forced to resign. The only reason for the resignation was that it was thought that management of the company by local people might stimulate interest in the sale of the houses and sites. At the same time, Watchie also resigned as trustee for the Seattle syndicate and the defendant Walter R. Lommel was designated as trustee. At the time of the trial both Watchie and the employes of H. R. Watchie & Associates, Inc. appeared to be the persons still primarily active in advancing the sales of the corporation property. It is also acknowledged that Watchie has outstanding a personal guarantee of a loan made to plaintiff corporation of about $2,000,000 by a: New York financial institution.

In April of 1966, this suit was filed in which the plaintiff corporation alleged that Watchie, as the promoter of plaintiff corporation, and acting in a fiduciary capacity in relation to the corporation, bought the Skyline property for $729,000 and sold it to the corporation at a price of $1,458,000. It was further alleged that Watchie thereby violated his fiduciary relationship by realizing this large profit, and that he did so without disclosing the existence of his alleged

profit to the subsequent subscribers. The complaint prayed that the remaining balance due on the purchase money contract between Watchie and the corporation be cancelled and that the plaintiff be entitled to judgment against all of the defendants for any excess over the fair market value of the property at the time the corporation acquired it. The trial court found that the plaintiff had failed to prove the allegations of its complaint.

■ Plaintiff's cause of suit is based upon a doctrine originally formulated in this country in the Massachusetts case of *Old Dominion Copper Mining & Smelting Co. v. Bigelow,* 1909, 203 Mass 159, 89 NE 193. We read that case to hold that the promoter of a corporation owes to the corporation, and its subsequent subscribers of stock, a fiduciary duty. This duty is violated if he schemes to and does secretly acquire property or the right to buy property which he knows the corporation will require and sells it to the corporation, while he still retains control of the corporation, at a secret profit which is not disclosed to the later subscribers or to an independent board of directors of the corporation. In that event the corporation may bring an action to recover the secret profits. Oregon has adopted this theory in *Wills v. Nehalem Coal Co.,* 1908, 52 Or 70, 96 P 528. The doctrine is generally recognized. See 1 Fletcher, Corporations (rev ed 1963) ch 9, § 194 et seq.

The best expression we have found of the precise rule which delineates the particular kind of factual situation in which the corporation is permitted the remedy of the recovery of secret profits is in *Wills v. Nehalem Coal Co., supra,* 52 Or at 81, and it is this:

"If two or more persons associate themselves for the purpose of purchasing property, and one

of them represents to the others that particular property can be bought for a designated price, which he procures to be paid by the associates, when in truth the purchase is for a less sum, and he has received the difference between the two sums, no doubt he may be compelled to account for such differences, though the property may be worth all that was paid for it. The same principle applies as against promoters of corporations. Hence, if any of them has a secret contract for the purchase of property, the terms of which are more favorable than those disclosed by him, or an agreement that he shall have stock in the corporation without paying therefor, any advantage which he thereby obtains is a fraud on the other shareholders and upon the corporation, and he will not be permitted to retain it: * * * And he may be compelled to account for such difference without rescission of the contract. * * *." (*Citing cases).

Plaintiff's complaint alleged facts which would bring the case within the factual situation covered by the rule just quoted. As before mentioned, the allegations of the complaint are limited to charges that Watchie was the promoter of plaintiff corporation; that he personally contracted to buy the Skyline property, that he formed plaintiff corporation and while he was in the complete control of it, sold the property to the corporation for double his own purchase price and that Watchie "did not disclose to either the Board of Directors or the stockholders of plaintiff corporation that [Watchie] would make a profit of $729,000 by reason of said contract." These are the pertinent allegations of the complaint.

■ The evidence does not sustain the allegations. In the complete transaction, as described in the evidence, the property was bought by the Seattle syndicate. It was not bought with the scheme or design of selling

it to this or any other persons or corporation but it was held for sale at the price specified. Contrary to the allegations, Watchie did not participate in any part of the profit made by the Seattle syndicate in the contract for the sale of the property, except for the commission paid to H. R. Watchie & Associates, Inc. In the contract with plaintiff corporation, Watchie was named as the vendor. But he was acting, admittedly, only as the trustee for the Seattle syndicate. He was not the true vendor or the recipient of any of the profits, as alleged. Nor is there any evidence that at any time, Watchie as an individual or as trustee schemed to overload the profit on unsuspecting subscribers.

However, the evidence did establish that Watchie made a personal profit in the form of the commission he received for the transaction. The commission was actually received by H. R. Watchie & Associates, Inc., but it is Watchie's alter ego. Because of his failure to disclose his dual relationship, he should be required to return this personal profit to plaintiff. Bogert, Trusts & Trustees, (2d ed, 1965) § 16, p 86. This means that he should not be charged with the whole commission received. He should be charged with that part which can be said to result from his non-disclosure.

The subscription agreement informed all subscribers that there would be a commission in the present transaction payable to Watchie or H. R. Watchie & Associates, Inc., by the corporation. This commission was described in the subscription agreement as one-ninth of the cost of the property to Watchie or Watchie & Associates, Inc. It also provided that he was to receive his actual costs. Thus everyone that was involved

in the venture was aware that there would be a profit to Watchie.

As a result of his non-disclosure, however, there is an ambiguity concerning what was the cost to Watchie for determining the amount of his authorized profit on the transaction; the price at which he purchased the property for the Seattle syndicate or the price he arranged between the syndicate and the plaintiff corporation. Since this ambiguity is solely the result of Watchie's non-disclosure of his relationship with the syndicate it would seem that the proper course would be to resolve the ambiguity against Watchie and in favor of the corporation that the cost referred to in the subscription agreement was the original cost.

This necessitates a holding that Watchie would only be entitled to a commission based on the initial cost of $729,000 or a commission of $81,000. Plaintiff is, therefore, entitled to a judgment accordingly. But, in addition, Watchie would be entitled to retain the actual costs that either he or that H. R. Watchie & Associates, Inc. incurred in the transaction between the syndicate and plaintiff. These costs we cannot definitely determine from the record.

The decree is modified to the extent stated and the cause remanded to the trial court to make the necessary finding as to the costs for which Watchie should receive credit and to enter a decree accordingly.