Argued February 13, affirmed March 26, petition for rehearing
denied April 22, 1970. Petition for review denied
by Supreme Court June 23, 1970

TAYLOR ᴇᴛ ᴀʟ, *Appellants, v.* RUBEY,
*Respondent.*

467 P2d 132

*Ray G. Brown,* Portland, argued the cause for appellants. With him on the brief were Frank B. Reid, Eugene, and Bernard F. Bednarz, Salem.

*Edward V. O'Reilly,* Eugene, argued the cause for respondent. On the brief were O'Reilly, Anderson, Richmond & Adkins, Eugene.

Before SCHWAB, Chief Judge, and LANGTRY and FOLEY, Judges.

LANGTRY, J.

This is an appeal from a circuit court order overruling objections to the final accounting of the coexecutor, E. E. Rubey. The widow and son, who were the only heirs under the will of T. M. Nielsen, deceased, are the objectors. The objecting widow, who is now Mrs. Taylor, was the other co-executor of the estate.

T. M. Nielsen died March 22, 1955, and his will was admitted to probate on March 24, 1955. He had owned and operated extensive rock crushing, road building, and logging enterprises. The property had a net value of about $440,000 plus. Much of the business continued in operation, by virtue of court order, after probate commenced. The deceased was an equal owner with G. P. Pitchford in two corporations, Tri-County Rock Company and Crescent Rock Company. Evidence, consisting of statements by E. E. Rubey and books in his possession, indicates that the deceased and Pitchford were also equal partners under oral agreements in Oceanway Transport and T & P Enterprises,

Inc. Mr. Rubey is a Certified Public Accountant who took care of deceased's book and tax work preceding his death. When the will was admitted to probate the widow and Mr. Rubey filed the petition therefor, and among other things, nominated Burt Thompson, G. P. Pitchford and Loy Rowling to be appraisers of the estate. Nothing purporting to be an inventory or appraisal of the estate was filed until August 30, 1956, 17 months after probate commenced. During the interval the co-executors, signing together, petitioned six times for the sale of extensive amounts of personal property. Three of the petitions resulted in court orders authorizing sales of property totaling $205,000 plus, and were signed by Frank B. Reid, Circuit Judge. The other three orders, totaling approximately $63,000, were signed by A. T. Goodwin, Circuit Judge.

On August 20, 1956, the co-executors petitioned to have Edward V. O'Reilly appointed as appraiser in the place of Burt Thompson. Judge Reid signed the order. As noted above, on August 30, 1956, a purported inventory and appraisal was filed. It was signed by Edward V. O'Reilly, G. P. Pitchford, and Loy Rowling as appraisers. It recites that the "annexed inventory" contains a true inventory of the property and their appraisal. But nothing was annexed to the form. On December 28, 1956, another similar form, similarly executed, was filed and this one does annex an inventory and appraisal of a total value of $440,030.17.

. Difficulties arose concerning the payment of estate and income taxes at about the time that the first final accounting was filed on August 27, 1957. In July 1959, after a hearing, Judge Reid signed an order transfer-

ring to Mrs. Taylor a $42,000 obligation that T. M. Nielsen, Jr., originally owed the estate. It appeared that T. M. Nielsen, Jr., son and heir in the estate, had borrowed $42,000 from the estate, defaulted, and a chattel mortgage on his property securing the loan was about to be foreclosed.

There was no hearing on the final accounting and the estate dragged on for years without any filing of the periodic accountings required by the probate code, or any other filing. A supplemental final accounting was filed on November 13, 1964. On December 16, 1964, Mrs. Taylor filed objections to the final accounting, Frank B. Reid appearing as her attorney. He also appeared as attorney for T. M. Nielsen, Jr., filing objections "on behalf of" the latter. Sometime between 1959 and 1964 Mr. Reid had ceased to be a circuit judge and began acting as an attorney for the objecting heirs. Mr. O'Reilly became attorney for the estate, although he had been one of the appraisers. He had been a partner in the firm which had represented the co-executors from the start, but that partnership had dissolved in the long interval. The objections were heard in 1968, about four years after they were filed.

The objections to the final accounting were centered upon the disposition of the two corporations and two partnerships mentioned above. All of them, except Oceanway Transport, appear to have been listed in the amended inventory and appraisal "as of March 22, 1955," which was filed December 28, 1956. The proceeds from a sale of Oceanway Transport appear to have been otherwise accounted for in the inventory and appraisal. No orders appear in the record authorizing the disposition of any of these entities. However, Mr. Ruhey's testimony and exhibits he produced from

income tax records satisfactorily proved that as of May 31, 1955, there was a balancing-out of book valuations, assets and liabilities of these four entities; that the estate received a note and cash on hand approximating a total value of $40,000; that Mr. Pitchford received equipment, etc., and then assumed sole proprietorship of the companies. The tax records in evidence show that the balancing left a sum of $8,612.92 due to Mr. Pitchford. On direct examination, Mr. Rubey testified that the estate issued its check for $78,000 to Mr. Pitchford to balance out these assets and liabilities. On cross-examination by Mr. Bednarz, counsel who was associated with Mr. Reid, there were no questions about a $78,000 payment which, if it was what Mr. Rubey really said, was a startling development. Mr. Bednarz did cross-examine at length about the figure of $8,612.92. The arguments in the briefs and oral argument before this court made much of this discrepancy. This court called for the cancelled vouchers which should show whether the estate check was actually $78,000 or $8,612.92. We were informed by counsel, and later by the clerk of the probate court, that no cancelled vouchers have been filed in this estate. This, in spite of ORS 117.010, requiring vouchers with accountings. In view of this record, we are unable to understand the discrepancy in any way except that Mr. Rubey at the time he was reported to have said "$78,000" actually may have said "$7 or 8,000." At that point we note he was testifying without the written records before him. Mr. Rubey's counsel has apparently made no effort to clarify the record.

The basis for the objections of Mrs. Taylor and T. M. Nielsen, Jr., is that Mr. Pitchford, an appraiser for the estate who necessarily was acting in a fidu-

ciary capacity, was allowed to acquire the deceased's interest in the partnership and corporations. They allege that the principal value in these entities was in Tri-County Rock Company and that five days after Mr. Pitchford obtained it from the estate for $17,000 plus, he sold it for $150,000. A review of his explanation of the alleged sale for $150,000 convinces us that the facts do not bear out the objectors' assertions. He used the Tri-County Rock Company in a trade for a building in Pomona, California, which was apparently greatly over-valued. The undisputed testimony is that the building had been empty for nine years preceding the hearing and was condemned.

Nevertheless, the manner of settlement of Mr. Pitchford's and deceased's interests in the partnerships and corporations was highly irregular, if not illegal. As noted, some $268,000 in property was sold under court order before any formal inventory and appraisal was filed. But no written petition was filed or order entered providing for or confirming disposal of the partnerships and corporations.

> "No particular pleadings or forms * * * are required * * * in * * * probate * * * and the mode of procedure * * * is in the nature of a suit in equity * * *. The proceedings must be in writing and upon the petition of a party * * * or the order of the court * * *." ORS 115.010.

No appraisal of the four entities was made before disposal, and it appears that none was ever made for one of the partnerships. ORS 116.450 requires that "Within 30 days after the death of a partner, the surviving partner shall file a verified inventory of the assets * * *." This section then requires an ap-

praisal of the assets to be made and filed by the surviving partner. This statute was ignored.

ORS 116.820 provides that an executor or administrator shall not purchase property from the estate. A similar Oregon statute does not exist with reference to an appraiser. But case law holds that a fiduciary relationship is created, and the appraiser may not acquire estate property. *Armstrong v. Huston's Heirs,* 8 Ohio 552 (1838); *Brown v. Nelms,* 86 Ark 368, 112 SW 373 (1908). In the latter case the court said:

> "Nothing is found in the [Arkansas] statute forbidding appraisers from becoming purchasers at the sale  * * *. In making the appraisement he performs an important and substantial service for the protection of the estate, and we deem it to be the soundest policy to hold that when he accepts the office he disqualifies himself from becoming a purchaser. That rule works no hardship to the appraiser, and it shuts the door to opportunity for concealed fraud.
>
> "The rule which forbids one who has a duty to perform with reference to such a sale rests upon sound public policy, and not upon the actual perpetration of fraud. One of the forbidden class who purchases will not be heard to say that he intended no wrong and perpetrated no actual fraud." 86 Ark at 391-92.

The respondent urges upon us the holding in *Barth v. Fidelity & Columbia Trust Co.,* 188 Ky 788, 224 SW 351 (1920), where it was held for reasons of *stare decisis* that an appraiser could purchase estate property. It should be noted that the court there said: "* * * [A]n appraiser may become a purchaser of property *he has appraised* * * *." (Emphasis supplied.) Mr. Pitchford acquired the partnership property May 31, 1955, and the appraisal was not filed

until August 30, 1956. The face of the record makes it appear that the appraisal couldn't have been made before August 20, 1956, for one of the appraisers, all of whom signed both inventory and appraisal forms, was not appointed until that date.

We deem it unnecessary to discuss whether there are circumstances under which a partner may acquire partnership assets from the deceased's estate. (See ORS 116.450 et seq.; *Kimball v. Baxter*, 67 Cal App 635, 228 P 381 (1924); *Wilson v. Meyer* [*In re Auerbach's Estate*], 23 Utah 529, 65 P 488 (1901); *State Bank v. Bagley Bros.*, 44 Wyo 244, 11 P2d 572 (1932).) Because he was an appraiser, Pitchford's acquisition of the partnership property before the inventory and appraisal was filed was improper.

In view of the questionable actions of various persons interested in this estate, were it not for acquiescence by and laches of the objectors, we would rule that the objections should be sustained. The questionable actions include the following:

(1) That a judge who signed orders disposing of property and appointing appraisers, which orders could be called in question, should become an attorney for the objectors after he ceased to be judge;

(2) That an appraiser for the estate should be the attorney first for the co-executors and thereafter for one co-executor of the estate in a proceeding attacking acts of the other.

(3) That partnership assets should have been disposed of without an authorizing or confirming order of the court;

(4) That the appraiser/partner, Pitchford, who

was in violation of ORS 116.450 et seq., acquired partnership property before an appraisal was filed;

(5) That the estate was allowed to remain open for about fourteen years with only three accountings filed, in violation of ORS 117.010.

However, as indicated, we think the trial court was correct in overruling the objections because Mrs. Taylor and T. M. Nielsen, Jr., acquiesced in on the one hand, and allowed to stagnate on the other hand, the basis of the objections they make. A probate proceeding is "substantially a suit in equity," and a probate court may ignore stale claims. *In re Webster's Estate,* 74 Or 489, 145 P 1063 (1915).

While the settlement of the Pitchford-Nielsen assets and liabilities was progressing in 1955, Mr. Rubey testified that their values were explained to Mrs. Taylor prior to any transactions being completed, and she signed the check which was paid out of the estate to Mr. Pitchford. He stated that she never voiced any objections to the way the affairs were settled. On cross-examination, Mr. Rubey testified:

"* * * We had pointed out to Mrs. Nielsen [Taylor] and to Ted Junior that it—there were difficulties in the operation of Tri-County Rock which was the primarily active business at that time * * *. Mrs. Nielsen [Taylor] was not happy with the trend of the thing. I was not happy with it, and Ted Junior agreed that the thing was not operating as it should, and there was no dissent as I recall when it was worked out with Mr. Pitchford that we would effect a transfer of those equities to him as of May 31."

In her testimony Mrs. Taylor said that she had always co-signed all estate checks. She said that she

never really understood the Pitchford transaction, but when questioned as to whether she felt during the entire transaction that there was anything concealed from her, she said "No, I certainly don't * * * In any respect at all."

T. M. Nielsen, Jr., who was about 24 years of age at the time the questioned transactions were completed, did not himself sign or file any objections, although Mr. Reid signed "on his behalf." He made no appearance at the hearing. The objections were filed on December 16, 1964, more than nine years after the transactions in question. Four more years elapsed before there was a hearing, although one could have been set at any time.

The accountings indicate that Mrs. Taylor received in the neighborhood of $179,000 from the estate over a period of about fourteen years. As already noted, T. M. Nielsen, Jr., has also received benefits from the estate. In *Hiller v. Ladd*, 85 F 703 (9th Cir 1898), cert den 173 US 703, 19 S Ct 885, 43 L Ed 1184 (1899), it was held that even if a surviving wife did not during the time covered by the probate proceedings know the nature of her husband's estate, and that she was not aware of the contents of a release she signed, and never learned the facts until shortly before the commencement 14 years later of the suit which presented her objections:

> " * * * [H]er laches would, nevertheless, bar her from recovery in this suit; for it is not disputed that she was one of the executors of the will, that she knew the provisions of the will, and knew that she signed a paper consenting to a distribution." 85 F at 721.

Other cases where objections under similar circumstances were denied on the basis of laches are *Gutt-*

*man v. Guttman,* 65 Ill App 2d 44, 212 NE2d 699 (1965), and *Sullivan v. Moran,* 340 Mass 782, 162 NE2d 801 (1959). See also, *In re Webster's Estate,* supra. In *Wallace's Estate,* 299 Pa 333, 149 A 473 (1930), it was held that where heirs joined or acquiesced in transactions and waited 15 years to make objections, they were barred by laches. In *Raymond v. Flavel,* 27 Or 219, 238, 40 P 158 (1895), the court said:

> "\* \* \* In order to call into activity a court of equity there must be an exercise of good conscience, good faith, and a reasonable diligence; and where time and long acquiescence have obscured the nature and character of the trust, or the acts of the parties, or other circumstances, give rise to presumptions unfavorable to its continuance, the court is passive and does nothing, because of its inability to do complete justice \* \* \*."

See also *Wills v. Nehalem Coal Co.,* 52 Or 70, 96 P 528 (1908).

We think that the objectors had full access to and knowledge of the facts. This combined with their acquiescence, acceptance of benefits, and unreasonable delay in making objections, invokes the doctrine of laches against otherwise valid objections to the final and supplemental final accountings.

With this conclusion we affirm the holding of the trial court in spite of the irregularities we have noted in the proceedings.

**Affirmed.**